DECLARATION.
U.S. Southern Circuit, ) ( Circuit Court, N. Carolina District. ) ( June Term, 1792.
Archibald Hamilton and John Hamilton, merchants, of Great Britain, and copartners in trade, under the firm of Archibald Hamilton and Company, complain of John Eaton, surviving obligor of Gabriel Long, dec'd, citizen of and resident within the State and district of North Carolina, and within the jurisdiction of this honorable court, in custody of the Marshal of the said district, etc., of a plea that he render to them eight hundred pounds, proclamation money, of the value of 2,000 dollars, money of the United States, which to them he owes, (642) *Page 538 
and from them unjustly detains: for that, whereas the said defendant, on the eleventh day of August, in the year 1777, at the county of Halifax aforesaid, in the province and district aforesaid, one of the United States of America, in the southern circuit, and now within the jurisdiction of this honorable court, made his certain writing obligatory, sealed with his seal and to the court shown here thereon, and the date whereof is on the same day and year aforesaid, whereby the said defendant did bind and oblige himself to pay to them, the said Archibald and John, the aforesaid sum of 800 pounds of the value aforesaid, whenever afterwards he should be thereto required.
Nevertheless the said defendant did not, nor hath not paid to them, the said Archibald and John, the aforesaid sum of eight hundred pounds of the value aforesaid, although often required, and particularly on the tenth day of May, in the year 1789, at the county aforesaid, within the State and district aforesaid, and within the jurisdiction of this honorable court, but the same to them to pay, has hitherto altogether refused and still does refuse to pay, and detain the same, to the damage of the said plaintiffs five hundred dollars, and therefore they bring suit, etc.
W. R. DAVIE, pro Quaer.
John Doe and Richard Roe, pledges.
PLEAS IN BAR.
I. And the said John Eaton, by John Haywood, his attorney, comes and defends the force and injury, when, etc., and craves oyer of the writing obligatory aforesaid: and it is read to him in these words, to wit:
Know all men by these presents, that we, John Eaton and Gabriel Long, of the county of Halifax and province of North Carolina, are held and firmly bound unto Archibald Hamilton Co., of the county and province aforesaid, in the just and full sum of eight hundred pounds, proclamation money, to be paid unto the said Archibald Hamilton Co., their certain attorney, their heirs, executors, administrators, or (643) assigns: To which payment, well and truly to be made, we bind ourselves, our heirs, executors, and administrators, firmly by these presents. Sealed with our seals, and dated this eleventh day of August, Anno. Dom. 1777.
And he likewise craves oyer of the condition of the said writing obligatory, and it is read to him in these words, to wit:
The condition of the above obligation is such, that if the above bound John Eaton and Gabriel Long do and shall well and truly pay, or cause to be paid, unto the said Archibald Hamilton Co., their certain attorney, their executors, administrators, or assigns, the just sum of four hundred pounds like money, on or before the first day of August next, *Page 539 
with lawful interest from the date, then the above obligation to be void: or else to remain in full force and virtue.
Which being read and heard, the said John Eaton saith, that the said plaintiffs ought not to have or maintain their said action against him, because he saith, that on the 4th day of July, in the year of our Lord 1776, and from thence continually afterwards unto the thirtieth day of November, in the year of our Lord 1782, there was an open war between the King of Great Britain and the United States of America, and that on the said fourth day of July, in the said year of our Lord 1776, the aforesaid plaintiffs, and each of them, were residents and inhabitants of this State, and continued to reside and inhabit within the same, until the twentieth day of October, in the year of our Lord 1777; on which said twentieth day of October the said plaintiffs withdrew themselves, and each of them withdrew himself from this State, and from the United States of America, to wit, at the county of Halifax in this State; and continually afterwards, from the day last aforesaid until the termination of said war, the said plaintiffs and each of them resided beyond the limits of the said United States, under the sovereignty and jurisdiction of the said king, owning and acknowledging their allegiance to him, and during all the time last aforesaid the said plaintiffs, or either of them, did not return into this State to be admitted as a citizen of citizens thereof; and that during the time of the said war between (644) the said King of Great Britain and the said United States of America, by a certain act of the General Assembly, held at Halifax on the 18th day of Oct. in the year of our Lord 1779, entitled "An act to carry into effect an act passed at New Bern in the year 1777, entitled an act for confiscating the property of all such persons as are inimical to this or the United States, and of such persons as shall not within a certain time therein mentioned appear and submit to the State, whether they shall be received as citizens thereof, and of such persons as shall so appear, and shall not be admitted as citizens, and for other purposes therein mentioned," reciting that whereas it is enacted by the aforesaid act passed at New Bern, in November, one thousand seven hundred and seventy-seven, that all the lands, tenements, and hereditaments, and movable property within this State, and all and every right, title, and interest therein of which any person was seized or possessed, or to which any person had title, on the 4th day of July, in the year 1776, who, on the said day was absent from this State, and every part of the United States, or who has withdrawn himself from this or any of the United States, after the day aforesaid, and still resider beyond the limits of the United States, shall and are hereby declared to be confiscated to the use of this State, unless such person shall, at the next General Assembly, which should be held after the first day of November, in the year 1777, *Page 540 
appear and be admitted to the privilege of a citizen of this State, and restored to the possession or property which to him once belonged within the same; and whereas, divers persons who come within the descriptions of the aforesaid recited act, had failed or neglected to appear before the said General Assembly as last mentioned, or at any General Assembly since, and submit to the State whether they should be admitted as citizens thereof, and restored to the possessions which to them once belonged, whereby such certain persons thereinafter mentioned had clearly incurred and become liable to the penalties of the aforesaid (645) first recited act, in consideration thereof, by the authority of the same General Assembly, it was therein enacted, that all the lands, tenements, hereditaments, and personal property within this State, of divers persons therein particularly named, and among others of John Hamilton and Archibald Hamilton, by the names of John Hamilton and Archibald Hamilton, late of Halifax, and of all others coming within the meaning of the said confiscation act, and of that act passed at Halifax, and all and every the right, title, and interest, which all, or each of the persons aforesaid, may have had therein on the said fourth day of July, in the year 1776, or at any time since should be and were thereby declared to be confiscated fully and absolutely forfeited to this State, and should be vested in the hands of commissioners as in the said act directed to be appointed for the purposes thereinafter mentioned. And by the authority of the same General Assembly, it was further therein enacted that commissioners should be appointed by the County Court in each county, who is their respective counties should have full power and authority to take possession of all lands, tenements, hereditaments, moneys, debts, whether due by judgment, bond, bill, note, account, or otherwise, and all other personal property of the persons aforesaid, in the name and for the use of the State, which thereby were declared to be forfeited to the said State, and give receipts and discharge which should forever indemnify all persons delivering or paying the same, their heirs, executors, or administrators, against any future claim for the articles or money mentioned in such receipts or discharges. And by the authority of the same General Assembly, it was therein further enacted, that the said commissioners might order the several constables to summon any of the inhabitants in their respective counties to appear before them, at convenient times and places, to render on oath an account of such forfeited property, and that they, or a majority of them being present, should administer on oath or affirmation to the inhabitants so appearing, whereby each inhabitant, rendering an account, should swear or affirm that the account by him rendered contained a true and full (646) account to the best of his knowledge, of all the lands, tenements, hereditaments, debts, moneys, and all personal property in the *Page 541 
county or elsewhere, which belonged on the fourth day of July, in the year of our Lord 1776, to any of the (therein) before mentioned person or persons, or at any time since, who came within or are included by the descriptions, or either of them recited in the said act or the confiscation act, passed at New Bern, in the year 1777, and that he had not disposed or parted with the same, or any part thereof, to elude or evade the intent and meaning of the confiscation act, or of that act passed at Halifax; and further, that the said account contained, to the best of his recollection, the full amount of all and every sum and sums of money which then were by him due and owing to any such person or persons, including interest, if any due, by bond, note, or account, or by virtue of any trust whatever; and if any person summoned as aforesaid should fail to appear, or, appearing, should fail to render an account as above mentioned, on oath or affirmation, as the case might be, in such case the said commissioners, or a majority of them, should have power to commit such person, if present, to close gaol until he or she could comply with the law; and if absent, should issue a warrant, directed to any sheriff or constable, to apprehend and bring such absent person before them, at any place, on a future day, when, if he or she should refuse to render an account on oath or affirmation as aforesaid, he or she should also be committed to close gaol, until he or she should render an account on oath as aforesaid; and the said commissioners were thereby invested with power to administer the oath, issue warrants, and make commitments, in manner aforesaid. And the said commissioners were thereby invested with full power and authority to demand, make distress for, and receive all sums of money due and owing by the inhabitants of their respective counties, and declared forfeited by the said act, and were thereby made liable to account for the same to the public treasurer of this State. And the said John Eaton further saith, that on the day of the making of the aforesaid act, passed at Halifax, and also from the day of the date of the said (647) writing obligatory, and from thence continually afterwards, until this present day, he, the said John, hath been an inhabitant of the said State, being and residing within the same, to wit, at the county of Halifax aforesaid, and that after the making of the aforesaid act passed at Halifax, the Court of Pleas and Quarter Sessions of the said county, held for the said county, at the town of Halifax, in the said county, on the ______ day of _________, in the year of our Lord 1780, duly appointed Samuel Weldon, William Wooting, and William Montfort to be commissioners for the purposes aforesaid, in the said act expressed, for the said county of Halifax, who then and there accepted the appointment, and having duly qualified themselves for the same, by performing and complying with the several requisitions by law prescribed in such case, then and there took upon themselves the exercise thereof; and that the said *Page 542 
commissioners, after their appointment and qualification as aforesaid, caused the said John Eaton to be summoned according to the directions of the aforesaid act, to appear before them on the fifteenth day of April, in the year of our Lord 1780, in the county aforesaid, to give in on oath an account, among other things, of all and every the sum and sums of money as aforesaid, by him due and owing to the persons aforesaid; whereupon the said John Eaton then and there appeared before the said commissioners and rendered to them, on oath, an account of the sum of £ 460, being the principal and interest then due, in the said writing obligatory above specified, and that afterwards, to wit, on the same day and year last aforesaid, in the county aforesaid, that he, the said John Eaton, by the commissioners aforesaid was required to pay them the said sum of four hundred and sixty pounds, according to the directions and intent of the act aforesaid; and that he, the said John Eaton, thereupon then and there, paid to the said commissioners the aforesaid sum of £ 460, being the whole sum mentioned in the condition aforesaid, and all the interest therefore then due; and that thereupon the said commissioners, then and there, made and delivered to him the said (648) John Eaton, a receipt and discharge of and for the sum aforesaid, by him paid as aforesaid, according to directions of the act aforesaid; and this he is ready to verify. Wherefore, he prays judgment, whether the said plaintiffs ought to have or maintain their said action against him; together with this, that he is ready to verify that the said John Hamilton and Archibald Hamilton, above named in the said declaration, and the said John Hamilton and Archibald Hamilton, in the aforesaid act of the said General Assembly, likewise named, are the same and not different persons.
II. And the said John Eaton further saith, that the said John Hamilton and Archibald Hamilton ought not to have and maintain their said action against him, because he saith that on the fourth day of July, in the year of our Lord 1776, and continually afterwards until the third day of September, in the year of our Lord 1782, a war was prosecuted and carried on against the United States of America by the King of Great Britain; and that in the time of the continuance thereof, by a certain act of the General Assembly of the State of North Carolina, held at New Bern on the fifteenth day of November, in the year of our Lord 1777, it was, among other things, enacted by the authority of the same General Assembly, that all the lands, tenements, hereditaments, and movable property, within this said State, and all and every right, title and interest therein, of which any person was seized, or to which any person had title on the fourth day of July, in the year of our Lord 1776, who, on the aforesaid day, was absent from the said State and every part of the United States, and who then was still absent from the same, *Page 543 
and then at any time during the war had attached himself to or aided or abetted the enemies of the said United States; or who then had withdrawn himself from the said State, or any of the United States, and who then resided beyond the limits of the said United States, should be and are thereby declared to be confiscated to the use of the said State, unless such persons should, at the next General Assembly, which should be held after the first day of October, in the year 1778, appear and be by the said Assembly admitted to the privilege of a citizen of (649) this said State, and restored to the possession and property which to him once belonged within the same. And the said John Eaton further saith, that afterwards, by one other act of the General Assembly of this State aforesaid, held at Halifax on the eighteenth day of October, in the year of our Lord 1779, reciting the act last aforesaid, and that whereas divers persons, who come within the description of the aforesaid recited act, had failed or neglected to appear before the said General Assembly as therein mentioned, or at any General Assembly (then) since, and submit to the State whether they should be admitted as citizens thereof, and restored to the possessions which to them once belonged, whereby such certain persons in the said last mentioned act thereinafter mentioned, had clearly incurred and became liable to the penalties of the aforesaid first recited act, in consideration thereof, it was enacted by the authority of the same General Assembly, held at Halifax as aforesaid, amongst other things, that all the lands, tenements, hereditaments, and personal property within the said State, of divers persons in the said last mentioned act named, and among others, of John Hamilton and Archibald Hamilton, then late of Halifax, and of all others who then came within the meaning of the aforesaid act first above mentioned, and of the said last mentioned act, and all and every the right, title, and interest, which all or each of the persons aforesaid may have had therein on the said fourth day of July, 1776, or at any time (then) since, should be, and thereby are declared to be confiscated, fully and absolutely forfeited to the said State, and should be vested in the hands of commissioners as therein directed to be appointed for the purpose thereinafter mentioned; and it was thereby further enacted, that commissioners should be appointed by the County Court in each county, who should have full power and authority to take possession of all lands, tenements, hereditaments, moneys, debts, whether due by judgment, bond, bill, note, account, or otherwise, and other personal property of the persons aforesaid, in the name and for the use of the said State, which by (650) the said act were declared to be forfeited to the said State, and should give receipts and discharges which should forever indemnify and acquit the persons delivering or paying the same, their heirs, executors, and administrators, against any further claim for the articles or money *Page 544 
mentioned in such receipts or discharges. And the said John Eaton further saith, that in the time when the said war was yet continuing, and upon the said fourth day of July, in the year of our Lord 1776, and continually afterwards, until the time of their departure from this State, hereinafter mentioned, the said plaintiffs, in the said declaration named, were residents, and each of them was a resident, inhabiting and residing within the limits of the said State of North Carolina, to wit, in the county of Halifax, and that they, the said plaintiffs, while the said war was yet continuing, and after the said fourth day of July, in the year of our Lord 1776, and before the making of the said acts hereinbefore mentioned, or either of them, that is to say, on the first day of September, in the year of our Lord 1777, at the county of Halifax aforesaid, did withdraw themselves, and each of them did withdraw himself, from this said State; and that they, the said plaintiffs, and each of them, at the time of the making of the said first mentioned act, and also at the time of the said last mentioned act, and each of them, resided beyond the limits of the United States of America, and that they, the said plaintiffs, or either of them, at the time of the making of the aforesaid last mentioned act, had not, nor had either of them, appeared before any General Assembly of the said State, to be admitted a citizen or citizens thereof, and to be restored to the possession and property which to them once belonged within the same; nor had the said plaintiffs, or either of them, after their departure from this State as aforesaid, ever at any time thereafter, been admitted as citizens thereof, and restored to the possession and property which to them once belonged as aforesaid. And the said John Eaton saith, that at the time of passing the acts hereinbefore mentioned, and each of them, and long before that time, that is to (651) say, from the day of the date of the writing obligatory aforesaid until the present day, that he, the said John Eaton, hath been continually an inhabitant and resident of this State, dwelling and residing within the same, to wit, at the county of Halifax aforesaid. And so the said John Eaton saith, that by reason of the premises, and by force of the acts of the General Assembly in such case made and provided, the debt aforesaid in the declaration aforesaid, and in the writing obligatory aforesaid, above specified, hath been and is now confiscated and fully and absolutely forfeited to and vested in the said State; and this he is ready to verify.
Wherefore he prays judgment, whether the said John Hamilton and Archibald Hamilton ought to have or maintain their said action against him, together with this, that he, the said John Eaton, is ready to verify that the said John Hamilton and Archibald Hamilton in the said declaration, and the said John Hamilton and Archibald Hamilton, *Page 545 
likewise above named herein, and also in the act aforesaid, passed at Halifax, are the same and not different persons.
III. And the said John Eaton, for further plea in bar saith, that by the aforesaid act, passed at Halifax, reciting that whereas many persons, who before that time refused to take the oath of allegiance to the State, and were compelled to leave the same in consequence thereof, by virtue of an act of Assembly, passed at New Bern, in April, in the year of our Lord 1777, entitled an act for declaring what crimes and practices against the State shall be treason, and what shall be misprision of treason, and providing punishments adequate to crimes of both classes, and for preventing the dangers which may arise from persons disaffected to the State; and of another act passed at New Bern, in November, in the year 1777, to amend the aforesaid act, had failed or neglected to sell or convey their real estates, agreeable to the said acts, and to appoint lawful agents and attorneys to receive and give discharges for debts due and owing by the inhabitants of the said State, to persons who so departed therefrom, whereby many lands of the persons last described were then yet undisposed of, and still continued to be and (652) remain to the use of the same, and many well meaning people were defeated of an opportunity to discharge such debts due as aforesaid; in consideration thereof, it was enacted, that all such lands of the persons described in these said last recited acts, which had not then been sold and disposed of bona fide, for a valuable consideration, actually paid, and all debts, money, and personal property belonging to the same, then not yet collected and appropriated, according to the directions of the said acts therein recited, should be and thereby were declared to be forfeited to the aforesaid State, and the commissioners aforesaid were thereby directed to proceed on such real and personal estate, in like manner as on the estate of the persons therein first mentioned, anything contained in the said recited acts to the contrary notwithstanding. And the said John Eaton further saith, that the said plaintiffs, and each of them, before the making of the said acts, passed at Halifax, had refused, and each of them had refused, to take the oath of allegiance in the said first recited acts prescribed, that is to say, on the ______ day of ______, in the year of our Lord 1777, in the State aforesaid, at the county of Halifax; and that therefore they, the said plaintiffs, were compelled, and each of them was compelled, to leave the said State, by virtue of and in pursuance of the first of the said recited acts; that is to say, at the county of Halifax aforesaid; and that they, the said plaintiffs, at the time of the making of the said act, passed at Halifax, had not appointed any lawful agents or attorneys to receive and give discharges for the debts due and owing to them from the inhabitants of the State aforesaid. And the said John Eaton further said, that he, said John Eaton, at the time of the *Page 546 
making of the aforesaid act, passed at Halifax, and continually before that time, from the day of the date of the writing obligatory aforesaid, had been an inhabitant of the aforesaid State, living and residing within the same, to wit, at the county of Halifax aforesaid. And so the said John Eaton saith, that by means of the premises, and by force of (653) the acts of the General Assembly of the State aforesaid, in such cases made and provided, that the debt aforesaid in the declaration aforesaid, by the said John and Archibald Hamilton demanded of him was, and is, confiscated and fully and absolutely forfeited to the aforesaid State of North Carolina, and this he is ready to verify. Wherefore, he prays judgment, whether the said John Hamilton and Archibald Hamilton ought to have or maintain their said action against him.
IV. And the said John Eaton, for further plea in bar, saith that by the aforesaid act, passed at Halifax, reciting that whereas many persons who, before that time, refused to take the oath of allegiance to this State, and were compelled to leave the same, in consequence thereof, by virtue of an act of Assembly passed at New Bern, in April, in the year of our Lord 1777, entitled an act for declaring what crimes and practices against the State shall be treason, and what misprision of treason, and providing punishment adequate to crimes of both classes, and for preventing the dangers which may arise from persons disaffected to the State; and of another act, passed at New Bern, in November, in the year 1777, to amend the aforesaid act, had failed or neglected to sell or convey their real estates, agreeable to the said acts, and to appoint lawful agents and attorneys to receive and give discharges for debts due and owing by the inhabitants of the said State, to persons who so departed therefrom, whereby many lands of the persons last described were then yet undisposed of, and still continued to be and remain to the use of the same, and many well meaning people were defeated of an opportunity to discharge such debts due as aforesaid; in consideration thereof, it was enacted that all such lands of the persons described in these said last mentioned acts which had not then been sold and disposed of bona fide
for a valuable consideration actually paid, and all debts, money, and personal property belonging to the same, then not yet collected and appropriated, according to the directions of the said acts therein recited, should be and thereby were declared to be forfeited to the aforesaid State, and the commissioners aforesaid were thereby directed to (654) proceed on such real and personal estate, in like manner as on the estate of the persons therein first mentioned; anything contained in the said recited acts to the contrary notwithstanding. And the said John Eaton further saith, that the said plaintiffs, and each of them, before the making of the said acts, passed at Halifax, had refused and each of them had refused to take the oath of allegiance in the said first *Page 547 
recited acts prescribed; that is to say, on the ______ day of _________, in the year of our Lord 1777, in the State aforesaid, at the county of Halifax, and that therefore they, the said plaintiffs, were compelled, and each of them was compelled to leave the said State, by virtue of and in pursuance of the first of the said recited acts; that is to say, at the county of Halifax aforesaid, and that they, the said plaintiffs, at the time of the making of the said act, passed at Halifax, had not appointed any lawful agents or attorneys to receive and give discharges for the debts due and owing to them from the inhabitants of the State aforesaid; and the said John Eaton further saith, that he, the said John Eaton, at the time of the making of the aforesaid act, passed at Halifax, and continually before that time, from the day of the date of the writing obligatory aforesaid, had been an inhabitant of the aforesaid State, living and residing within the same, to wit, at the county of Halifax aforesaid. And so the said John Eaton saith, that by means of the premises and by force by the acts of the General Assembly of the State aforesaid, in such cases made and provided, that the debt aforesaid, in the declaration aforesaid, by the said John Hamilton and Archibald Hamilton demanded on him was, and is confiscated, and fully and absolutely forfeited to the aforesaid State of North Carolina; and this he is ready to verify. Wherefore, he prays judgment, whether the said John Hamilton and Archibald Hamilton ought to have or maintain their said action against him. JOHN HAYWOOD, pro Def.
REPLICATIONS. (655)
I. And the said Archibald and John Hamilton, as to the plea of the said John Eaton, by him first above pleaded in bar, say that they, by reason of anything in that plea alleged, ought not to be barred from having or maintaining their said action thereof against him. Because, protesting that, that plea and the matters therein contained are not sufficient in law to bar the said Archibald and John Hamilton from having or maintaining their said action against the said John Eaton for replication, they, the said Archibald and John Hamilton, say that true it is, that on the said fourth day of July, in the said year 1776, and from thence continually afterwards until the said thirtieth day of November, in the said year 1782, there was an open war between the said King of Great Britain and the United States of America aforesaid; and that on the said fourth day of July, in the said year 1776, the said Archibald and John Hamilton were residents and inhabitants, and each of them was a resident and inhabitant, of this State, and continued to reside and inhabit within the same until the said twentieth day of October, in the year 1777, aforesaid. Yet the said Archibald and John Hamilton *Page 548 
further say, that by an act made and provided in a General Assembly of the State of North Carolina, begun and held at New Bern aforesaid, in the said State of North Carolina, and now in the district of North Carolina, and within the jurisdiction of this Court, after the said fourth day of July, in the year 1776 aforesaid, and before the time of making the said writing obligatory, to wit, on the eighth day of April, in the year 1777 aforesaid, entitled "An act declaring what crimes and practices against the State shall be treason, and what shall be misprision of treason, and providing punishments adequate to crimes of both classes, and for preventing the dangers which may arise from persons disaffected to the State" (among other things), it is enacted, by the authority of the same General Assembly, that all the then late officers of the King of Great Britain, and all persons (Quakers excepted) being subjects (656) of the said State, and then living therein, or who should thereafter come to live therein, who had traded immediately to Great Britain or Ireland, within ten years then last passed, in their own right, or acted as storekeepers, factors, or agents here, or in any of the United States of America, for merchants residing in Great Britain or Ireland, should take a certain oath of abjuration and allegiance therein mentioned, or depart out of the said State; and it is by the same act provided that all and every such person and persons should have liberty, and that they might also nominate and appoint an attorney or attorneys, to sell and dispose of his or their estate for his or their own use and benefit, as by the same act (among other things) may more fully appear. And the said Archibald and John Hamilton further say that they, on the said eighth day of April, in the year 1777 aforesaid, and long before then, were, and from the time of their nativities, respectively, continually hitherto have been, and still are, subjects of and owing allegiance to, the said King of Great Britain; and that they, the said Archibald and John Hamilton, on the same day and year last aforesaid, and for a long time, to wit, the space of ten years before the making of the same, and until the said twentieth day of October in the said year 1777, were merchants and copartners, living in the then State, and formerly province of North Carolina aforesaid, and had within, and during the said space of ten years last past, before the making of the same act, traded immediately to Great Britain, to wit, at _________ in their own right; that is to say, at the State of North Carolina aforesaid, and now in the district of North Carolina aforesaid, and within the jurisdiction of this Court. And after the said eighth day of April, in the year 1777 aforesaid, and before the said twentieth day of October, in the said year 1777, to wit, on the same ____ day of _____, in the said year 1777, at North Carolina aforesaid, now in the said district of North Carolina and within the jurisdiction of this Court, the said John Eaton made his said writing *Page 549 
obligatory in the said declaration mentioned, and by the same writing obligatory he, the said John Eaton, then and there bona fide contracted the said debt in the said declaration mentioned. And the (657) said Archibald and John Hamilton further say, that after the said eighth day of April, in the said year 1777, and after the making of the said writing obligatory, to wit, on the said twentieth day of October, in the year 1777 aforesaid, they, the said Archibald and John Hamilton, then being merchants and copartners as aforesaid, and having lived, resided, and inhabited, and then living, residing, and inhabiting in the State of North Carolina aforesaid, in the manner hereinbefore mentioned, and having traded immediately to Great Britain aforesaid, within and during ten years last past before the making of the same act as aforesaid, and then being the subjects of and owing allegiance to the said King of Great Britain as aforesaid. And the said John Eaton, having contracted the said debt bona fide with the said Archibald and John Hamilton aforesaid; and the said Archibald and John Hamilton, being creditors in that respect as aforesaid, did withdraw themselves from the said State, and from the United States of America aforesaid, and they, and each of them, did remove and depart out of the said State, to wit, to Europe, in conformity to the tenor, true intent, and meaning of, and in obedience to, the same last mentioned act of the General Assembly; and continually afterwards from the said twentieth day of October, in the said year 1777, until the termination of the said war, the said Archibald and John Hamilton resided beyond the limits of the said United States, under the sovereignty and jurisdiction of the said King, owing and acknowledging their allegiance to him; and during all the time last aforesaid, they, the said Archibald and John Hamilton, did not, nor did either of them, return unto the said State to be admitted as citizens or a citizen thereof. And the said Archibald and John Hamilton further say, that afterwards such act of the General Assembly held at Halifax, on the eighteenth day of October, in the year 1779 aforesaid, entitled "An act to carry into effect an act passed at New Bern in the year 1777, entitled an act for confiscating the property of all such persons as are inimical to this or the United States, and of such persons as shall not within a certain time therein mentioned (658) appear and submit to the State whether they shall be received as citizens thereof, and of such persons as shall so appear and shall not be admitted as citizens, and for other purposes therein mentioned, and for other purposes," was made as in the same plea alleged, and that on the day of the making of the aforesaid act at Halifax, and also from the day of the date of the said writing obligatory and from thence continually afterwards, until the day of pleading the same in bar, the said John Eaton hath been an inhabitant of the said State, being and *Page 550 
residing within the same, to wit, at the county of Halifax aforesaid, and that after the making of the said act passed at Halifax, the Court of Pleas and Quarter Sessions for the said county, held for the said county, at the town of Halifax in the said county, on the ______ day of _____, in the said year 1780, duly appointed the said Samuel Weldon, William Wooting, and William Montfort to be commissioners for the purpose aforesaid, in the said act expressed, for the said county of Halifax, who then and there accepted the said appointment, and having duly qualified themselves for the same, by performing and complying with the several requisites by law prescribed in such case, then and there took upon themselves the exercise thereof; and that the said commissioners, after their said appointments and qualifications aforesaid, caused the said John Eaton to be summoned, according to the directions of the aforesaid act, in the same plea in bar mentioned, to appear before them, on the said fifteenth day of April, in the said year 1780, in the county aforesaid, to give in on oath an account (among other things) of all and every the sum and sums of money aforesaid, by him due and owing to the persons aforesaid; whereupon the said John Eaton then and there appeared before the said commissioners, and rendered to them on oath an account of the sum of four hundred and sixty pounds, being the principal and interest then due on the said writing obligatory above specified; and that afterwards, to wit, on the same day and year last aforesaid, in the county aforesaid, he, the said John Eaton, by the commissioners (659) aforesaid, was required to pay them the said sum of £ 460, according to the directions and intent of the act aforesaid in the same plea in bar mentioned; and that he, the said John Eaton, thereupon then and there paid to the said commissioners the foresaid sum of four hundred and sixty pounds, being the whole sum mentioned in the condition aforesaid, and all the interest thereupon then due; and that upon the said commissioners, then and there made and delivered to him, the said John Eaton, a receipt and discharge of and for the sum aforesaid by him paid as aforesaid, according to the direction of the act aforesaid in the same plea in bar mentioned. Yet the said Archibald and John Hamilton further say, that by the definitive treaty of peace between the United States of America aforesaid and his Britannic Majesty aforesaid, made and done at Paris, after the said fourth day of July, in the said year 1776, and after the time of making of the said writing obligatory, and after the departure of the said Archibald and John Hamilton, in conformity and obedience to the act of the General Assembly hereinbefore pleaded, and after the passing of the said act of the said General Assembly in the same plea in bar pleaded, to wit, on the third day of September, in the year of our Lord 1783, it is (among other things) stipulated and agreed that creditors on either side should meet with no lawful *Page 551 
impediment to the recovery of the full value, in sterling money, of allbona fide debts theretofore contracted, as by the same treaty (among other things) may more fully appear. And the said Archibald and John Hamilton further in fact say, that they, at the time of the making of the said definitive treaty, and for a long time before then, to wit, on the said _____ day of ______, in the said year 1777, were, and from that same day continually hitherto, have been, and still are, creditors of the said John Eaton, by virtue of the writing obligatory in the said declaration mentioned, in manner and form as therein is declared, and on the said of his said Brittanic Majesty, within the true intent and meaning of the said definitive treaty (that is to say), at the State of North Carolina aforesaid, now in the district of North Carolina, and (660) within the jurisdiction of this Court, and that they, the said Archibald and John Hamilton, at the time of the making of the said definitive treaty, at and before the passing of the said act of the General Assembly in the same plea in bar pleaded, and at and before the departing of the said Archibald and John Hamilton, in conformity to the act of the General Assembly hereinbefore pleaded, by way of reply, and on the said and before the time of the making of the said writing obligatory in the said declaration mentioned, and at and before the time of the making of the said act hereinbefore pleaded, by way of reply, and on the said fourth day of July, in the said year 1776, and long before, then and from the times of their nativities respectively, were, and from thence continually hitherto have been, and still are, subjects of his said Britannic Majesty, owing and acknowledging their allegiance and obedience to him. And that the said debt, in the said declaration mentioned, was contracted, and the said writing obligatory therein also mentioned made and executed by the said John Eaton, bona fide, before the time of the making of the said definitive treaty (to wit), on the said _______ day of ________, in the said year 1777, and the same debt still remains wholly due and owing from the said John Eaton to the said Archibald and John Hamilton, and hath not, nor hath any part thereof been paid or satisfied to them, or either of them (that is to say), at the State of North Carolina aforesaid, and in the said district of North Carolina, and within the jurisdiction of this Court. And the said Archibald and John Hamilton further say, that by the Constitution ordained and established by the people of the United States, for the United States of America, done in convention after the said third day of September, in the said year 1783 (to wit), on the seventeenth day of September, in the year of our Lord 1787, it is (among other things) expressly declared that all treaties which were then made, or which should be made under the authority of the United States, should be the supreme law of the land, anything in the said Constitution or laws of any state to the contrary *Page 552 
notwithstanding, as by the same Constitution more fully appears. (661) And the said Archibald and John Hamilton further say, that, by an act made and provided in a General Assembly of the State of North Carolina, begun and held at Tarboro, now in the district of North Carolina aforesaid, and within the jurisdiction of this Court, after the said third day of September, in the said year one thousand seven hundred and eighty-three, and after the said seventeenth day of September, in the said year 1787 (to wit), on the eighteenth day of November, in the year of our Lord 1787, and in the twelfth year of the independence of the said State, entitled an act declaring the treaty of peace between the United States of America and the King of Great Britain to be part of the law of the land, it is enacted by the authority of the same General Assembly that the articles of the definitive treaty between the United States of America and the King of Great Britain were thereby declared to be part of the law of the land. And it was also thereby further enacted by the same authority, that the courts of law and equity were thereby declared in all cases and questions cognizable by them, respecting the said treaty, to judge accordingly; as by the same act more fully appears. Wherefore, for that the said Archibald and John Hamilton were merchants, and were and are subjects of the said King of Great Britain, and creditors on his side as aforesaid; and the said debt wasbona fide contracted before the making of the said definitive treaty, and the ordaining and establishing of the said Constitution, and the passing of the said act declaring the said definitive treaty to be part of the law of the land; they, the said Archibald and John Hamilton, pray judgment and their said debt, together with their damages, occasioned by the detaining of the same, to be adjudged to them, etc.
II. And the said Archibald and John Hamilton, as to the said plea of the said John Eaton, by him secondly above pleaded in bar, say that they, by reason of anything in that same plea alleged, ought not to be barred from having or maintaining their said action thereof against him; because, protesting that, that same plea and the matters therein contained are not sufficient in law to bar the said Archibald and John (662) Hamilton from having or maintaining their said action against the said John Eaton; for replication they, the said Archibald and John Hamilton, say that true it is that on the said fourth day of July, in the year 1776, and continually afterwards, until the said third day of September, in the said year 1782, a war was prosecuted and carried on against the United States of America by the King of Great Britain; and that, in the time of the continuance thereof, such act was made and passed by and at a General Assembly of the State of North Carolina, held at New Bern aforesaid, on the said fifteenth day of November, in the year 1777 aforesaid, as in the same plea in bar that behalf is alleged; *Page 553 
and that afterwards the said other act was made and passed by and at the General Assembly of North Carolina, held at Halifax aforesaid, on the said eighteenth day of October, in the year 1779 aforesaid, as in the same plea in bar in that behalf is also alleged; and that in the time when the said war was continuing, and upon the said fourth day of July, in the said year 1776, and continually afterwards, until the time of the departure of the said Archibald and John Hamilton from the said State hereinafter mentioned, they, the said Archibald and John Hamilton were residents, and each of them was a resident, inhabiting and residing within the limits of the said State (to wit), in the county of Halifax, and that the said John Eaton, at the times of the passing the acts in the same plea in bar mentioned, and each of them, and long before that time (to wit) from the day of the date of the said writing obligatory until the day of pleading the same plea in bar, hath been continually an inhabitant and resident of this State, dwelling and residing within the same (to wit), at the county of Halifax aforesaid. Yet the said Archibald and John Hamilton further say, that by an act made and provided in a General Assembly of the State of North Carolina, begun and held at New Bern aforesaid, in the said State of North Carolina, and now in the district of North Carolina, and within the jurisdiction of this Court, whilst the war was continuing, and after the said fourth day of July, in the year 1776 aforesaid, and before the said eighteenth day of October, in the said year 1779, and before the said fifteenth (663) day of November, in the said year 1777, and before the time of the making of the said writing obligatory (to wit), on the eighth day of April, in the said year 1777, entitled an act declaring what crimes and practices against the State shall be treason and what shall be misprision of treason, and providing punishments adequate to crimes of both classes, and for preventing the dangers which may arise from persons disaffected to the State (among other things), it is enacted by the authority of the same General Assembly that all the then late officers of the King of Great Britain, and all persons (Quakers excepted) being subjects of the said State, then living therein, or who should thereafter come to live therein, who had traded immediately to Great Britain or Ireland, within ten years then last past, in their own right, or acted as factors, storekeepers, or agents here, or in any of the United States of America, for merchants residing in Great Britain or Ireland, should take a certain oath of abjuration and allegiance therein mentioned, or depart out of the said State. And it is by the same act provided, that all and every such person and persons should have liberty, and that they might also nominate and appoint an attorney or attorneys, to sell and dispose of his or their estate for his or their use and benefit, as by the same act (among other things) may more fully appear. And the said Archibald and John *Page 554 
Hamilton further say, that they, on the said eighth day of April, in the year one thousand seven hundred and seventy-seven, aforesaid, and long before then, were, and from the time of their nativities respectively, continually hitherto have been, and still are, subjects of, and owing allegiance to, the said King of Great Britain. And that they, on the same day and year last aforesaid, and for a long time, to wit, for the space of ten years before the making of the same act last mentioned, and until the said first day of September, in the said year one thousand seven hundred and seventy-seven, were merchants and copartners, living in the then State, and formerly province of North Carolina (664) aforesaid, and had within and during the said space of ten years last past, before the making of the same last mentioned act, traded immediately to Great Britain, in their own right; that is to say, at the State of North Carolina aforesaid, and now in the district of North Carolina aforesaid, and within the jurisdiction of this Court; and after the said eighth day of April, in the said year 1777, and before the said first day of September, in the same year, to wit, on the said ______ day of _________, in the same year, at North Carolina aforesaid, and now in the district of North Carolina aforesaid, and within the jurisdiction of this Court, he, the said John Eaton, made his said writing obligatory, sealed with the seal of the said John Eaton, and the date whereof is the same day and year; and by the same writing, he, the said John Eaton, then and there bona fide contracted the said debt, in the said declaration mentioned. And the said Archibald and John Hamilton further say, that whilst the said war was continuing, and after the said fourth day of July, in the said year 1776, and after the said eighth day of April, in the said year 1777, and after the making of the said writing obligatory, and before the said fifteenth day of October, in the said year 1779, and before the said fifteenth day of November, in the said year 1777, to wit, on the said first day of September, in the said year 1777, they, the said Archibald and John Hamilton, then being merchants and copartners as aforesaid, and having lived, resided, and inhabited, and then living, residing, and inhabiting in North Carolina aforesaid, in the manner hereinbefore alleged, and having traded immediately to Great Britain aforesaid, within and during ten years last past, before the making of the said last mentioned act, as hereinbefore alleged, and then being the subjects of, and owning and acknowledging allegiance to, the said King of Great Britain as aforesaid, and the said John Eaton having contracted the said debt bona fide with the said Archibald and John Hamilton as aforesaid, and the said Archibald and John Hamilton being creditors in that respect as aforesaid, did withdraw themselves, and each of them did withdraw himself from the said State, and remove and depart (665) out of the said State, to wit, to Europe, in conformity to the *Page 555 
tenor, true intent, and meaning of, and in obedience to, the same last mentioned act of the General Assembly; and continually afterwards, from the said first day of September, in the said year 1777, and at the time of making of the said act, in the same plea secondly above pleaded in bar first mentioned, and also at the time of making of the said act in the same plea secondly above pleaded in bar last mentioned, and at the respective times of the making of each of them, they, the said Archibald and John Hamilton, resided beyond the limits of the United States of America, under the sovereignty and jurisdiction of the said king, owning and acknowledging their allegiance to him, and they, the said Archibald and John Hamilton, had not, nor had either of them, at the time of the making the said act in the same plea secondly above pleaded in bar last mentioned, appeared before any General Assembly of the said State, to be, nor had they or either of them after their departure from the said State as aforesaid ever at any time after been admitted a citizen or citizens thereof. And they, the said Archibald and John Hamilton, further say, that by the definite treaty of peace between the United States of America aforesaid and his Britannic Majesty aforesaid, made and done at Paris, after the said fourth day of July, in the year 1776, and after the time of the making of the said writing obligatory, and after the departure of the said Archibald and John Hamilton, in conformity and obedience to the act of the General Assembly herein before pleaded, and after the passing of the act of the General Assembly in the same plea in bar secondly above pleaded first mentioned, and after the passing of the act of the General Assembly in the same plea in bar secondly above pleaded last mentioned, to wit, on the third day of September, in the year of our Lord one thousand seven hundred and eighty-three, it is (among other things) stipulated and agreed that creditors on either side should meet with no lawful impediment to the recovery of the full value in sterling money of all bona fide debts therefore contracted, as by the same treaty (among other things) may more fully appear. And the said Archibald and John Hamilton (666) further in fact say, that they, at the time of the making of the said definitive treaty, and for a long time before then, to wit, on the said _____ day of ________, in the said year 1777, were, and from that same day, continually hitherto have been, and still are, creditors of the said John Eaton, by virtue of the said writing obligatory, in the said declaration mentioned, in manner and form as therein is declared; and on the side of his said Britannic Majesty, within the true intent and meaning of the said definitive treaty; that is to say, at the State of North Carolina aforesaid, and now in the said district of North Carolina, and within the jurisdiction of this Court; and that they, the said Archibald and John Hamilton, at the time of the making of the said definitive treaty, *Page 556 
and at and before the passing of the said act of the General Assembly, in the same plea in bar secondly above pleaded last mentioned, and at and before the passing of the said act of the General Assembly in the said plea in bar second above pleaded first mentioned, and at and before the departing of the said Archibald and John Hamilton, in conformity to the said act of the General Assembly hereinbefore pleaded by way of reply, and at and before the time of the making of the said writing obligatory in the said declaration mentioned, and at and before the time of the making of the said act of the General Assembly hereinbefore pleaded by way of reply, and on the said fourth day of July, in the said year 1776, and long before then, and from the times of their nativities respectively were, and from thence continually hitherto have been, and still are subjects of his Britannic Majesty, owing and acknowledging their allegiance to him. And that the said debt in the said declaration mentioned was contracted, and the said writing obligatory therein mentioned was executed by the said John Eaton, bona fide, before the time of the making of the said definitive treaty, to wit, on the said _______ day of _________, in the said year 1777, and the same debt still remains wholly due and owing from the said John Eaton to the said Archibald (667) and John Hamilton, and hath not, nor hath any part thereof been paid or satisfied to them, or either of them; that is to say, at the State of North Carolina aforesaid, and now in the said district of North Carolina, and within the jurisdiction of this Court. And the said Archibald and John Hamilton further say that by the Constitution ordained and established by the people of the United States of America, done in convention after the said third day of September, in the said year 1783, to wit, on the seventeenth day of September, in the year of our Lord 1787, it is (among other things) expressly declared that all treaties which were then made, or which should be made under the authority of the United States, should be the supreme law of the land, anything in the said Constitution or laws of any state to the contrary notwithstanding; as by the same Constitution more fully appears. And the said Archibald and John Hamilton further say that by an act made and provided in a General Assembly of the State of North Carolina begun and held at Tarboro, now in the district of North Carolina aforesaid, and within the jurisdiction of this Court, after the said third day of September, in the said year one thousand seven hundred and eighty-three, and after the said seventeenth day of September, in the said year 1787, to wit, on the eighteenth day of November, in the year of our Lord 1787, and in the twelfth year of the independence of the said State, entitled an act declaring the treaty of peace between the United States of America and the King of Great Britain to be part of the law of the land, it is enacted by the authority of the same General Assembly *Page 557 
that the articles of the definitive treaty between the United States of America and the King of Great Britain were thereby declared to be part of the law of the land. And it was also thereby further enacted by the same authority that the courts of law and equity were thereby declared in all cases and questions cognizable by them, respecting the said treaty, to judge accordingly; as by the same act more fully appears. Wherefore, for that the said Archibald and John Hamilton were merchants, and were and are subjects of the said King of Great Britain, and creditors on his side as aforesaid; and the said debt was bona fide (668) contracted before the making of the said definitive treaty, and the ordaining and establishing of the said Constitution, and the passing of the said act declaring the said definitive treaty to be part of the law of the land; they, the said Archibald and John Hamilton, pray judgment and their said debt, together with their damages, occasioned by the detaining of the same, to be adjudged to them, etc.
III. And the said Archibald and John Hamilton, as to the plea of the said John Eaton by him thirdly above pleaded in bar; say that they, by reason of anything in that plea alleged, ought not to be barred from having or maintaining their said action thereof against him. Because, protesting that, that plea and the matters therein contained are not sufficient in law to bar the said Archibald and John Hamilton from having or maintaining their said action against the said John Eaton, for replication they, the said Archibald and John Hamilton, say that true it is that the said John Eaton, at the time of making of the said act at Halifax in the same plea in bar thirdly above pleaded, and at the time of making of the said act passed at New Bern, in November in the year 1777, and the said act passed at Halifax as aforementioned, and continually before the said times respectively from the day of the date of the writing obligatory aforesaid, was, and had been an inhabitant of the said State, living and residing within the same (to wit), at the county of Halifax aforesaid. Yet the said Archibald and John Hamilton further say that, by an act made and provided in a General Assembly of the State of North Carolina, begun and held at New Bern aforesaid, in the said State of North Carolina, and now in the district of North Carolina, and within the jurisdiction of this Court, after the said fourth day of July, in the year 1776 aforesaid, and before the time of making the said writing obligatory, and before the passing of the said act of the General Assembly at Halifax, on the eighteenth day of October, in the year of our Lord one thousand seven hundred and seventy-nine, in the same plea mentioned, to wit, on the eighth day of October, in the year 1777 aforesaid, entitled "An act declaring what crimes and (669) practices against the State shall be treason and what shall be misprision of treason, and providing punishments adequate to crimes of *Page 558 
both classes, and for preventing the dangers which may arise from persons disaffected to the State" (among other things), it is enacted, by the authority of the same General Assembly, that all the then late officers of the King of Great Britain, and all persons (Quakers excepted) being subjects of the said State, and then living therein, or who should thereafter come to live therein, who had traded immediately to Great Britain or Ireland, within ten years then last past, in their own right, or acted as storekeepers, factors, or agents here, or in any of the United States of America, for merchants residing in Great Britain or Ireland, should take a certain oath of abjuration and allegiance therein mentioned, or depart out of the said State; and it is by the same act provided that all and every such person and persons should have liberty, and that they might also nominate and appoint an attorney or attorneys, to sell and dispose of his or their estates for his or their own use and benefit, as by the same act (among other things) may more fully appear. And the said Archibald and John Hamilton further say that they, on the said eighth day of April, in the year 1777 aforesaid, and long before then, were, and from the time of their nativities respectively continually hitherto have been and still are, subjects of, and owing allegiance to, the said King of Great Britain; and that they, the said Archibald and John Hamilton, on the same day and year last aforesaid, and for a long time (to wit), the space of ten years before the making of the same act, and until the time hereinafter mentioned, were merchants and copartners, living in the then State, and formerly province of North Carolina aforesaid, and had within and during the said space of ten years last past, before the making of the same act, traded immediately to Great Britain (to wit), at ________, in their own right (that is to say), at the State of North Carolina aforesaid, and now in the district of North Carolina aforesaid, and within the jurisdiction of this Court. And after (670) the said eighth day of April, in the year one thousand seven hundred and seventy-seven aforesaid, and before the time of the departure of the said Archibald and John Hamilton, hereinafter mentioned (to wit), on the same ______ day of ________, in the said year 1777, at North Carolina aforesaid, now in the said district of North Carolina and within the jurisdiction of this Court, the said John Eaton made his said writing obligatory in the said declaration mentioned; and by the same writing obligatory, he, the said John Eaton, then and there bonafide contracted the said debt in the said declaration mentioned. And the said Archibald and John Hamilton further say, that, after the said eighth day of April, in the said year 1777, and after the making of the said writing obligatory (to wit), on the ______ day of ______, in the year 1777 aforesaid, they, the said Archibald and John Hamilton, then being merchants and copartners as aforesaid, and having lived, resided, and *Page 559 
inhabited, and then living, residing, and inhabiting in the State of North Carolina aforesaid, in the manner hereinbefore mentioned, and having traded immediately to Great Britain aforesaid, within and during ten years last past before the making of the same act as aforesaid, and then being the subjects of, and owing allegiance to the said King of Great Britain as aforesaid, and the said John Eaton having contracted the said debt bona fide with the said Archibald and John Hamilton aforesaid; and the said Archibald and John Hamilton, being creditors in that respect as aforesaid, they and each of them did refuse to take the oath of allegiance to the said State in the said act prescribed, and did withdraw themselves from the said State and from the United States of America aforesaid, and they and each of them did remove and depart out of the said State (to wit), to Europe, in conformity to the tenor, true intent, and meaning of, and in obedience to, the same last mentioned act of the General Assembly. And they, the said Archibald and John Hamilton, further say, that by the definitive treaty of peace between the United States of America aforesaid and his Britannic Majesty aforesaid, made and done at Paris, after the said fourth day of July, in the said year 1776, and after the time of making of the said (671) writing obligatory, and after the departure of the said Archibald and John Hamilton, in conformity and obedience to the act of the General Assembly hereinbefore pleaded, and after the passing of the said act of the said General Assembly in the same plea in bar pleaded (to wit), on the third day of September, in the year of our Lord 1783, it is (among other things) stipulated and agreed that creditors on either side should meet with no lawful impediment to the recovery of the full value, in sterling money, of all bona fide debts theretofore contracted, as by the same treaty (among other things), may more fully appear. And the said Archibald and John Hamilton further in fact say, that they, at the time of the making of the said definitive treaty, and for a long time before then, to wit, on the said _______ day of ______, in the said year 1777, were, and from that same day continually hitherto have been, and still are creditors of the said John Eaton, by virtue of the writing obligatory in the said declaration mentioned, in manner and form as therein is declared, and on the side of his said Britannic Majesty, within the true intent and meaning of the said definitive treaty (that is to say), at the State of North Carolina aforesaid, now in the district of North Carolina, and within the jurisdiction of this Court, and that they, the said Archibald and John Hamilton, at the time of the making of the said definitive treaty, at and before the passing of the said act of the General Assembly in the same plea in bar pleaded, and at and before the departing of the said Archibald and John Hamilton, in conformity to the act of the General Assembly hereinbefore pleaded, by way of *Page 560 
reply, and at and before the time of the making of the said writing obligatory in the said declaration mentioned, and at and before the time of the making of the said act hereinbefore pleaded, by way of reply, and on the said fourth day of July, in the said year 1776, and long before, then and from the times of their nativities respectively, were, and from thence continually hitherto have been, and still are, subjects of his said Britannic Majesty, owing and acknowledging their allegiance and (672) obedience to him. And that the said debt, in the said declaration mentioned, was contracted, and the said writing obligatory therein also mentioned, made and executed by the said John Eaton bona fide, before the time of the making of the said definitive treaty, to wit, on the said ______ day of _______, in the said year 1777, and the same debt still remains wholly due and owing from the said John Eaton to the said Archibald and John Hamilton, and hath not, nor hath any part thereof, been paid or satisfied to them, or either of them; that is to say, at the State of North Carolina aforesaid, and in the said district of North Carolina, and within the jurisdiction of this Court. And the said Archibald and John Hamilton further say, that by the Constitution ordained and established by the people of the United States for the United States of America, done in convention after the said third day of September, in the said year 1783, to wit, on the seventeenth day of September, in the year of our Lord 1787, it is (among other things) expressly declared that all treaties which were then made, or which should be made, under the authority of the United States, should be the supreme law of the land, anything in the said Constitution or laws of any state to the contrary notwithstanding, as by the same Constitution more fully appears. And the said Archibald and John Hamilton further say, that by an act made and provided in a General Assembly of the State of North Carolina, begun and held at Tarboro, now in the district of North Carolina aforesaid, and within the jurisdiction of this Court, after the said third day of September, in the said year one thousand seven hundred and eighty-three, and after the said seventeenth day of September, in the said year 1787, to wit, on the eighteenth day of November, in the year of our Lord 1787, and in the twelfth year of the independence of the said State, entitled an act declaring the treaty of peace between the United States of America and the King of Great Britain to be part of the law of the land, it is enacted by the authority of the same General Assembly, that the articles of the definitive treaty between the United States of America and the King of Great Britain, were thereby (673) declared to be part of the law of the land. And it was also thereby further enacted by the same authority, that the Courts of Law and Equity were thereby declared in all cases and questions cognizable by them, respecting the said treaty, to judge accordingly; as by the *Page 561 
same act more fully appears. Wherefore, for that the said Archibald and John Hamilton were merchants, and were and are subjects of the said King of Great Britain, and creditors on his side as aforesaid; and the said debt was bona fide contracted before the making of the said definitive treaty, and the ordaining and establishing of the said Constitution, and the passing of the said act declaring the said definitive treaty to be part of the law of the land; they, the said Archibald and John Hamilton, pray judgment, and their said debt, together with their damages, occasioned by the detaining of the same, to be adjudged to them, etc.
IV. And the said Archibald and John Hamilton, as to the said plea of the said John Eaton, by him fourthly above pleaded in bar, say that they, by reason of anything in that same plea alleged, ought not to be barred from having or maintaining their said action thereof against him; because, protesting that, that same plea and the matters therein contained are not sufficient in law to bar the said Archibald and John Hamilton from having or maintaining their said action against the said John Eaton; for replication, they, the said Archibald and John Hamilton, say that true it is that on the said fourth day of July, in the year 1776, and continually afterwards, until the said thirtieth day of November, in the said year 1782, there was and open war between the said King of Great Britain and the United States of America aforesaid, and that on the said fourth day of July, in the said year 1776, the said Archibald and John Hamilton were residents and inhabitants, and each of them was a resident and inhabitant of this State, and continued to reside and inhabit within the same until the said 20th day of October, in the said year 1777. Yet the said Archibald and John Hamilton further say, that by an act made and provided in a General Assembly of the State of North Carolina, begun and held at New Bern aforesaid, in the (674) said State of North Carolina, and now in the district of North Carolina, and within the jurisdiction of this Court, after the said fourth day of July, in the year one thousand seven hundred and seventy-six aforesaid, and before the time of the making of the said writing obligatory, to wit, on the eighth day of April, in the said year 1777, entitled an act declaring what crimes and practices against the State shall be treason and what shall be misprision of treason, and providing punishments adequate to crimes of both classes, and for preventing the dangers which may arise from persons disaffected to the State (among other things), it is enacted by the authority of the same General Assembly, that all the then late officers of the King of Great Britain, and all persons (Quakers excepted) being subjects of the said State, then living therein, or who should thereafter come to live therein, who had traded immediately to Great Britain or Ireland, within ten years then last past, *Page 562 
in their own right, or acted as factors, storekeepers, or agents here, or in any of the United States of America, for merchants residing in Great Britain or Ireland, should take a certain oath of abjuration and allegiance therein mentioned, or depart out of the said State. And it is by the same act provided, that all and every such person and persons should have liberty, and that they might also nominate and appoint an attorney or attorneys to sell and dispose of his or their estate for his or their use and benefit, as by the same act (among other things) may more fully appear. And the said Archibald and John Hamilton further say, that they, on the said eighth day of April, in the year one thousand seven hundred and seventy-seven aforesaid, and long before then, were, and from the time of their nativities respectively, continually hitherto have been, and still are, subjects of, and owing allegiance to, the said King of Great Britain. And that they, on the same day and year last aforesaid, and for a long time, to wit, for the space of ten years before the making of the same act last mentioned, and until the said first day of September, in the said year one thousand seven hundred and (675) seventy-seven, were merchants and copartners, living in the then State, and formerly province of North Carolina aforesaid, and had within and during the said space of ten years last past, before the making of the same last mentioned act, traded immediately to Great Britain, in their own right; that is to say, at the State of North Carolina aforesaid, and now in the district of North Carolina aforesaid, and within the jurisdiction of this Court; and after the said eighth day of April, in the said year 1777, and before the said twentieth day of October, in the said year one thousand seven hundred and seventy-seven, to wit, on the same _____ day of __________, in the said year one thousand seven hundred and seventy-seven, at North Carolina aforesaid, now in the said district of North Carolina, and within the jurisdiction of this Court, he, the said John Eaton, made his said writing, obligatory in the said declaration mentioned, and by the same writing, he, the said John Eaton, then and there bona fide contracted the said debt in the said declaration mentioned. And the said Archibald and John Hamilton further say, that after the said eighth day of April, in the said year 1777, and after the making of the said writing obligatory, to wit, on the said twentieth day of October, in the year 1777 aforesaid, they, the said Archibald and John Hamilton, then being merchants and copartners as aforesaid, and having lived, resided, and inhabited, and then living, residing, and inhabiting in the State of North Carolina aforesaid, in the manner hereinbefore mentioned, and having traded immediately to Great Britain aforesaid, within and during ten years last past before the making of the same act as aforesaid, and then being the subject of, and owing allegiance to, the said King of Great Britain as aforesaid, and *Page 563 
the said John Eaton having contracted the said debt bona fide with the said Archibald and John Hamilton aforesaid; and the said Archibald and John Hamilton, being creditors in that respect as aforesaid, did withdraw themselves from the said State and from the United States of America aforesaid, and they and each of them did remove and depart out of the said State (to wit), to Europe, in conformity to the tenor, true intent, and meaning of, and in obedience to, the same (676) last mentioned act of the General Assembly, and continually afterwards, from the said twentieth day of October, in the said year 1777, until the termination of the said war, the said Archibald and John Hamilton resided beyond the limits of the said United States, under the sovereignty and jurisdiction of the said king, owing and acknowledging their allegiance to him, and during all the time last aforesaid, they, the said Archibald and John Hamilton, did not, nor did either of them, return into the said State, to be admitted citizens or a citizen thereof; and the said Archibald and John Hamilton further say, that true it is, that afterwards, such act of the General Assembly of this State, held at Halifax, on the eighteenth day of October, in the year 1779 aforesaid, was made as in the same plea in bar, fourthly above pleaded, is alleged. Yet they, the said Archibald and John Hamilton, further say, that by the definitive treaty of peace between the United States of America aforesaid and his Britannic Majesty aforesaid, made and done at Paris, after the said fourth day of July, in the said year 1776, and after the time of making of the said writing obligatory, and after the departure of the said Archibald and John Hamilton, in conformity and obedience to the act of the General Assembly hereinbefore pleaded, and after the passing of the said act of the said General Assembly in the same plea in bar pleaded (to wit), on the third day of September, in the year of our Lord 1783, it is (among other things) stipulated and agreed that creditors on either side should meet with no lawful impediment to the recovery of the full value, in sterling money, of all bona fide debts theretofore contracted, as by the same treaty (among other things) may more fully appear. And the said Archibald and John Hamilton further in fact say, that they, at the time of the making of the said definitive treaty, and for a long time before then (to wit), on the said ______ day of _____, in the said year 1777, were, and from that same day continually hitherto have been, and still are, creditors of the said John Eaton, by virtue of the writing obligatory in the said declaration mentioned, in manner and form as therein is declared, and on the side of his said (677) Britannic Majesty, within the true intent and meaning of the said definitive treaty (that is to say), at the State of North Carolina aforesaid, now in the district of North Carolina, and within the jurisdiction *Page 564 
of this Court; and that they, the said Archibald and John Hamilton, at the time of the making of the said definitive treaty, at and before the passing of the said act of the General Assembly in the same plea in bar pleaded, and at and before the departing of the said Archibald and John Hamilton, in conformity to the act of the General Assembly hereinbefore pleaded, by way of reply, and at and before the time of the making of the said writing obligatory in the said declaration mentioned, and at and before the time of the making of the said act hereinbefore pleaded, by way of reply, and on the said fourth day of July, in the said year 1776, and long before, then and from the times of their nativities respectively, were, and from thence continually hitherto have been, and still are, subjects of his said Britannic Majesty, owing and acknowledging their allegiance and obedience to him. And that the said debt, in the said declaration mentioned, was contracted, and the said writing obligatory therein also mentioned, made, and executed by the said John Eaton bonafide, before the time of the making of the said definitive treaty (to wit), on the said ______ day of ________, in the said year 1777, and the same debt still remains wholly due and owing from the said John Eaton to the said Archibald and John Hamilton, nor hath any part thereof been paid or satisfied to them or either of them; that is to say, at the State of North Carolina aforesaid, now in the said district of North Carolina, and within the jurisdiction of this Court. And the said Archibald and John Hamilton further say that by the Constitution ordained and established by the people of the United States for the United States of America, done in convention after the said third day of September, in the said year 1783 (to wit), on the seventeenth day of September, in the year of our Lord 1783, it is (among other things) expressly declared that all treaties which were then (678) made, or which should be made, under the authority of the United States, should be the supreme law of the land, anything in the said Constitution or laws of any State to the contrary notwithstanding; as by the same Constitution more fully appears. And the said Archibald and John Hamilton further say, that, by an act made and provided in a General Assembly of the State of North Carolina, begun and held at Tarboro, now in the district of North Carolina aforesaid, and within the jurisdiction of this Court, after the said third day of September, in the said year one thousand seven hundred and eighty-three, and after the said seventeenth day of September, in the said year 1787, to wit, on the eighteenth day of November, in the year of our Lord 1787, and in the twelfth year of the independence of the said State, entitled an act declaring the treaty of peace between the United States of America and the King of Great Britain to be part of the law of the land, it is enacted by the authority of the same General Assembly, that the articles of the definitive treaty between the United States of America and the *Page 565 
King of Great Britain, were thereby declared to be part of the law of the land.
And it was also thereby further enacted by the same authority, that the courts of law and equity were thereby declared in all cases and questions cognizable by them, respecting the said treaty, to judge accordingly; as by the same act more fully appears. Wherefore, for that the said Archibald and John Hamilton were merchants, and were and are subjects of the said King of Great Britain, and creditors on his side and aforesaid; and the said debt was bona fide contracted before the making of the said definitive treaty, and the ordaining and establishing of the said Constitution, and the passing of the said act declaring the said definitive treaty to be part of the law of the land; they, the said Archibald and John Hamilton, pray judgment and their said debt, together with their damages, occasioned by the detaining of the same, to be adjudged to them, etc. W. R. DAVIE, pro Quaer.
DEMURRERS. (679)
I. And the said John Eaton says that the plea aforesaid, by the said Archibald and John Hamilton, above in replying first pleaded, and the matters therein contained, are not sufficient in law to compel the said John Eaton to answer to the aforesaid declaration of said Archibald and John Hamilton, to which the said John Eaton has no necessity, nor is he, by the law of the land bound in any manner to answer, and this he is ready to verify. Wherefore, for default of a sufficient replication of the said Archibald and John Hamilton in this behalf, the said John Eaton, as before, prays judgment, whether the said Archibald and John Hamilton ought to have and maintain their said action against him, etc.
II. And the said John Eaton says that the plea aforesaid, by the said Archibald and John Hamilton, above in replying secondly pleaded, etc., as above.
III. And the said John Eaton says that the plea aforesaid, by the said Archibald and John Hamilton, above in replying thirdly pleaded, etc., as above.
IV. And the said John Eaton says that the plea aforesaid, by the said Archibald and John Hamilton, above in replying fourthly pleaded, etc., as above.
JOHN HAYWOOD, pro Def.
JOINDERS IN DEMURRER.
I. And the said Archibald and John Hamilton say that the plea aforesaid by them, the said Archibald and John Hamilton, in manner and from aforesaid first above in replying pleaded, and the matter therein *Page 566 
contained, are good and sufficient in law to compel the said John Eaton to answer to the declaration of them, the said Archibald and John Hamilton; which said plea and the matter therein contained the said Archibald and John Hamilton are ready to verify and prove, as the court, etc. And because the said John Eaton to that plea doth not answer, nor has hitherto any way denied it, the said Archibald and John Hamilton pray judgment, etc.
(680) II. And the said Archibald and John Hamilton say that the plea aforesaid by them, the said Archibald and John Hamilton, in manner and form aforesaid secondly above in replying pleaded, etc., as above.
III. And the said Archibald and John Hamilton say, that the plea aforesaid by them, the said Archibald and John Hamilton, in manner and form aforesaid thirdly above in reply pleaded, etc., as above.
IV. And the said Archibald and John Hamilton say that the plea aforesaid by them, the said Archibald and John Hamilton, in manner and form aforesaid fourthly above in replying pleaded, etc., as above.
W. R. DAVIE, pro Quaer.
At June Term, 1796, this cause was argued.
In examining this question, although the right of making the confiscation by our State Legislature is not denied by the pleadings, yet, with the view to show the extent of that right and to give the greater force to arguments which I shall draw from it, I beg the indulgence of this Court while I take a summary view of the doctrine, as explained by the most respectable writers on the laws of nations, and as recognized by the laws *Page 567 
of England. I then contend that a sovereign state may rightfully confiscate debts due from its citizens to the subjects of its enemy.
To prove this I will consider, first, the nature of war.
Vattel, page 519, sec. 138, says: "The business of a just war being to suppress violence and injustice, it gives a right to compel by force him who is deaf to the voice of justice; it gives a right of doing against the enemy whatever is necessary for weakening him, or disabling him from making any further resistance in support of his injustice; and the most proper methods may be chosen, provided they have nothing odious, be not unlawful in themselves, or exploded by the law of nature." If this is the case, it follows, of course, I humbly conceive, that a debt may be confiscated; for by that the State deprives the enemy of one great means of supporting the war against her. The amount of debts due to British subjects in the several states at the commencement of the war with Great Britain would have made no inconsiderable sum to be carried into the opposite scale; by depriving the enemy of this, which we do by withholding it from his subjects, we lessen his strength and add to our own; or, at least, we prevent the diminution of our own very considerably. For how would it have weakened and distressed us to have paid up debts to such a large amount, at that particular time, in specie (which was the only money that the creditors would receive), which would immediately have been carried out of the country, and we deprived of any benefit arising from the circulation of it among us? I presume that such a collection, could it have been made, would have taken every penny of the specie then in circulation; and it is unnecessary for me to dwell on the inconveniences and distresses the carrying it out of the country would have put our government to at that time; everybody knows the difficulties under which we had to struggle for the want of specie; although we were not drained of it as we should have been had these debts have been paid up. By withholding these debts, many whose greatest property consisted in them might, from motives of interest, remain among us and join in the defense of our liberties; and the enemy, from the cries and importunities of the creditors who deserted and left their debts unpaid, might be the more readily brought to a sense of justice towards us; which, the elegant author I have quoted says, we have a right to compel him to, by any just means in our power. If the right to confiscate debts is denied, what would not be the inconvenience and injustice of it? We should have to defend the property of our very enemy; for the property of the debtor to the amount of the debt, in fact, belongs to the creditor. It is, at least, the fund out of which it is to be paid, and upon which it is secured; the debtor protects and insures that fund against the creditor, who contributes nothing to its protection; but, on the contrary, by his conduct makes that protection and insurance more difficult and *Page 568 
expensive. In fact, it is against him alone that any exertion for that protection is necessary to be made. It cannot be denied but that property of every description, other than debts, may be confiscated; and, if so, it is surely just that debts also should be; otherwise, one party, whose property in the enemy's county consisted of debts, would have a material advantage over the other, who had property of other kind in the enemy's country, which might and would be confiscated.
Having observed this much, with the view to show that the right of confiscating debts is a right which every nation may lawfully exercise against its enemy, on the breaking out of a war, in conformity to those general rules before mentioned from Vattel, I will now trouble the Court with a few cases to prove more particularly that debts may be confiscated.
Vattel, p. 484, sec. 77, says: "Among the things belonging to the enemy are likewise incorporeal things; and all his rights, titles, and debts, excepting, however, those kind of rights granted by a third person, and in which he is so far concerned that it is not a matter of indifference to him by whom they are possessed. Such, for instance, are the rights of commerce. But, as debts are not of this number, was gives us the same right over any sum of money due by neutral nations to our enemy as it can give over his other goods." The same doctrine is laid down 3d Grotius, 143, and goes to show beyond question that, by the law of nations, a debt may be confiscated as well as anything else; even if that debt is due by a neutral nation to the enemy. and if so, much more ought it to be the case, when due by one of our own citizens, who is in our own country, and himself and property subject to no other power but the laws of our own government.
This right of confiscating debts is recognized by the law of England, which must also be the law here. Parker's Reports of Exchequer Cases, 27;"Attorney-General v. Weeden and Shales. In this case, upon long debate, it was resolved: 1. That choses in action, which belonged to an alien enemy, were forfeitable to the crown; Maynard's Edward 2, inter memorand. scaccar, 41.
"2. That this ought to be found by inquisition to make a title to the king, and that this was an inquisition of entitling and not of instruction.Page's case, 5 Co., 52.
"3. That the peace, being concluded before the inquisition was taken, discharged the cause of forfeiture.
"4. That the inquisition, taken afterwards, did not relate to set up their forfeiture; for the cause was but temporary, and that cause being removed before the king's title was found, the finding after should not relate." Here the doctrine, contended for by the defendant, is fully established; for it shows the right to make confiscations, although it was considered not to have been made in this case; because the requisites *Page 569 
were not performed until the peace, when the right ceased. But, in our case, I apprehend every necessary requisite was performed. The act of Assembly naming the party, and what property should be confiscated, of itself was equal to an inquest of entitling — and any further inquest that might possibly be necessary for any purpose in the case could not be considered in any other light than that of an inquest of instruction, which could not affect the right, and is only had for the purpose of assisting the officers of the revenue. This was answered in our case by the commissioners, who were appointed by the act to collect the debts, etc., especially, as the debt was actually paid into the hands of those commissioners.
In the courts of law of England, it is a good bar of the plaintiff's action to plead that he is an alien enemy. 1 Hale, 95; 1 Bacon's Abridgt., 84, 85; Cro. Eliz., 182. And every bar is perpetual. 6 Rep., 7; Ferrar'scase, ibid., 46; Higgins' case.
This also shows that a debt may be confiscated; for if this is a good bar to the action and that bar is perpetual, it must be on the principle that it is unlawful for the defendant to pay the debt to one who is an enemy, and who will use it to the injury of the State, whose subject he is; but it surely does not discharge the debtor, for that would operate as a benefit to the individual, and not to the community at large; for which there is no reason, and therefore the debt must belong to the State, which is placed in the shoes of the original creditor, and then he is properly barred from a recovery.
But this right of a sovereign state is recognized by the present judges of England. H. Black. Rep., 135, 149; 3 Term Rep., 731.
This right of a sovereign state is not usually exercised in England, because their Magna Charta provides in another manner for them. That is, by putting them in sequestration until it should be known how their merchants are treated in the enemy's country, and that if they were well treated, these should be so, too. This Magna Charta is a kind of constitutional act, and therefore cannot be considered to extend in its operation to this country, as we have a written Constitution of our own; and as we have not thought proper to introduce such a principle as this into the Constitution, it follows that the sense of the People was against it.
This is a regulation calculated to suit a mercantile country like that of Great Britain, being instituted for the convenience and protection of their merchants and the support of their trade; that trade from which they themselves derive such national support, and without which their fame as a nation would not, perhaps, even at this day, have for extended beyond the limits of their own little island. Even this regulation proves that the right I contend for may be exercised, if the government think *Page 570 
proper, and that it did exist before Magna Charta. If so, it must now exist here. This regulation is not used in England now, because by treaties with the European powers the merchants, on the breaking out of a war, are allowed a certain number of days to withdraw themselves and their effects, etc. Sullivan's Lectures, 527. But no such treaties are opposed to the right in our case; and in our case the right remains, therefore, as it was originally, cleared of all objections of this sort. If it is said to be unjust, and that it affects the sacred obligation of contracts, I answer that there is no more injustice in the state seizing on one kind of property than another. In either case, the person whose property is seized has an equal claim on his own sovereign for compensation for his loss; and, as to its affecting private contracts, the creditor having by his own conduct put himself out of the protection of the law which made the legal obligation of the contract, he is no more deprived of his right in the case of a debt than in the case of any other property which is taken from him. For, in either case, he is disabled to sue for redress; and, if the law did not provide in some manner for the case of the debtor, he would be the sufferer instead of the creditor; as there would be no one to whom he could lawfully pay his debt; and it is just and right that he should be authorized by some competent authority to discharge his contract when it became due, as the right to pay it to the original creditor is taken away. This mode of affecting the right to choses in action, by acts of the Legislature, is frequently exercised in England.
1. It is done by acts of attainder. 4 Bac. Abr., 214.
2. It is also done on conviction for treason or felony. 2 Bac. Abr., 577.
3. Also, by outlawry. 3 Bac. Abr., 754; 4 Ib., 214.
4. By bankruptcy, by force of the acts, although the debt be due in a foreign country. 4 Term Rep., 182; H. Blackst. Rep., 131, in notis.
5. It was also done, ipso facto, by the fourth sea act; which vested the whole estate of the directors in the hands of commissioners for the payment of their debts. 1 P. Williams, 895.
In these cases of forfeiture, the debt is so completely vested that the assignee of the king may sue in his own name. 4 Bacon, 214.
Having now established, unquestionably as I humbly conceive, the right of the State to confiscate the debt, I will proceed to show in the next place that they have made such confiscation, fully and absolutely. But the only parts of the confiscation acts which I shall beg the attention of the court to, at present, are the 2d section of the Act of 1779, entitled "Anact to carry into effect a former confiscation act, etc.," in which it is enacted: "That all the lands, tenements, and personal property, within the State, of a number of persons by name, and among the rest the *Page 571 
present plaintiffs, and of all others who come within the meaning of the confiscation and this act, and all and every the right, title, and interest which all or each of the said persons may have had therein, on the 4th day of July, 1776, or at any time since, shall be and hereby are declared to be confiscated, fully and absolutely forfeited to this State; and shall be vested in the hands of commissioners, as in this act directed, to be appointed for the purpose hereinafter mentioned;" and the 3d section of the same act, which, among other things, says: "The commissioners shall have full power and authority to take possession of all lands, tenements, hereditaments, moneys, debts, whether due by judgment, bond, bill, note, or otherwise, and all other personal property of the persons aforesaid, in the name and for the use of the State; and shall give receipts and discharges, which shall forever indemnify and acquit the persons delivering or paying the same, their heirs, executors, and administrators, against any future claim for the article or money mentioned in such receipt and discharge." This act is sufficiently full and explicit to vest the property of this debt in the State; and I feel satisfied that I have now established both the right to make the confiscation and the legal exercise of that right, in the manner set forth in the defendant's pleas. Here I might rest the case until the counsel for the plaintiff should show some legal ground upon which this debt, which was thus legally divested, has become since revested in his client, so as to entitle him to recover notwithstanding this act. But in this case the debt was actually received by the State, and thereby became extinct, as between the original creditor and debtor. To prove this it is only necessary, I conceive, to state again what I have already proved, that is, that the State had the right of confiscation, and that they exercised that right. For then it follows necessarily that the State, having taken the creditor's right to herself, has lawfully a right to receive the debt of the debtor; and, therefore, the debt was lawfully paid. And, if once lawfully paid, it is surely entirely discharged as much as it could be in case of a payment to the creditor himself, or any assignee of his, or any other person lawfully authorized to receive, whether under authority from him or any other competent authority; the contract was entirely at an end, there being, after this payment, neither debt, debtor, nor creditor. This appears to me to be such a necessary and clear conclusion that it would not need the aid of authority. I shall therefore adduce only one in support of it, and that is Bynk. 2, J. P. L., 1, c. 7, who says: "What I have said of things in action being rightly confiscated holds thus: If the prince really exacts from his subjects what they owed to our enemies. If he shall have exacted it, it is rightfully paid. If he shall not have exacted it, peace being made, the former right of the creditor revives accordingly. It is for the most part agreed among nations that things *Page 572 
in action, being confiscated in war, the peace being made, those which are paid are deemed to have perished, and remain extinct. But those not paid revive, and are restored to their true creditors." After having shown the confiscation and discharge of the debt in this manner, I shall proceed to consider the operation of the 4th article of the treaty of peace, relied on in the replication as a repeal of the confiscation acts.
1. This 4th article may be considered as standing alone, and unconnected with any other article of the treaty.
2. As connected with the two following clauses.
As standing alone, whether it be a repeal of the Act of 1779 or not, depends upon what ought to be considered the meaning of the word creditors, which is of doubtful signification as used in this place. It may mean those who were creditors at the time of the treaty, their debts not being transferred from them by confiscation to the State, and then remaining unpaid; or it may mean those who had been creditors and were then unpaid, although their debts might have been transferred to the State by confiscation.
To give to this clause the meaning first mentioned will entitle creditors of the first class only to recover. But to give it the other, those of each class, and, of course, the present plaintiffs, will be entitled to recover; if the payment to the State does not alter the case, which it undoubtedly does, for surely it is not reconcilable to our understandings to call those creditors whose debts have been once legally discharged. Which of those two meanings is to prevail must depend upon the true rules of sound construction.
1. I conceive, then, that the State, having lawfully acquired those debts by a clear title, is entitled to retain that acquisition until as clear a relinquishment be shown. Vatt., 645, sec. 21.
2. Where a treaty will admit of two different constructions, that which changes the present state of things is to be rejected; and that in favor of the possession to be received; this is the clear opinion of Vattel, 399, sec. 305.
If the present plaintiffs can recover, under the authority of the treaty, the state of things in our country is changed in this respect. At least, the money which the plaintiffs seek a recovery of was legally and absolutely in our possession; as much so as property of this kind could be in any case. The very money was in our treasury; and, if they are now to recover it of the defendant, it must be taken out again to reimburse him. If this is not changing the state of things as they existed at the time of the treaty, I confess I am ignorant of what would.
3. In cases of doubt, the construction ought to be against the proposer of the article. Vattel, 651, sec. 32; Gro., ch. 20, sec. 26. This is a clause inserted, beyond doubt, at the instance and for the benefit of the *Page 573 
other party; it is not reasonable to suppose that we should voluntarily propose such a one, which is thus calculated to confer such a benefit on them at our expense. If it was incumbent on them to express themselves more explicitly, and they have not done so, it is their own fault, and not ours. Is it fair or just to extend this construction the length contended for, to the advantage of the proposer of the article, when it will lead to such absurdities, and when, if that had been the real intention of the parties, they might and ought to have expressed themselves in such a manner as to have left no room for doubt? How easy would it have been to have said that these recoveries should be effected, in all cases of a debt due at the commencement of the war, notwithstanding the confiscation laws, etc. That would have put the business, so far as it regarded the intention, at least beyond doubt. Surely, if their meaning had been what is contended for, the words I have mentioned, or some other more fully to express that meaning, would have been used. But our commissioners never would have acceded to such an article; they knew too well the limits of their authority to agree to anything of the kind, as will plainly be seen when the following clauses of the treaty are considered. I say our commissioners had no authority to enter into a treaty that would have the extensive operation which it is pretended this 4th article ought to have. Some of the states could not pass retrospective laws; and, of course, Congress, their deputies or delegates, could not do any act which would have such an operation on rights legally acquired under the laws of any state; nor could a majority of the states exercise such a right. How, then, could Congress, which is a representation of the states and for a particular limited purpose? Congress had the right to make treaties for the United States, beyond doubt. But those treaties were to operate as compacts, and the faith of the several states stood pledged for the performance of them, so far as Congress acted with good faith and within the limits assigned to them by the spirit of the confederation. If they, by their treaties, interfered with the internal police of a particular state, as they were only chosen to manage the general concerns of the Union and not of a particular state, that state was not bound until she passed an act to adopt the treaty as a part of her laws; Congress, knowing this, would not stipulate positively to do anything which should interfere with the laws of any state; but, in such cases, would only agree to recommend to the several states what they wished done; which, in most cases, would have the same effect. But it would not in all; nor could it in any, without the consent of the states, explicitly given by passing laws in conformity to it. This it will be seen is the part Congress, or their commissioners, did act with regard to this very business, in that part of the 5th article of the treaty, which is recommendatory. And this leads me to consider the 4th article, *Page 574 
2. As connected with the two subsequent articles, the 5th and 6th.
This appears to me to be the true way to consider it; and this will be the more necessary when we consider the short, vague terms of this 4th article, and give to the other two the construction that is reasonable when compared with the 4th. By a different mode of construction one article might militate directly against another; and it would be impossible to account for the true meaning of every part of the treaty satisfactorily. The propriety of this mode of construction is so self-evident that I shall produce but a single authority to support it. Vattel, 383, sec. 285: "We ought to consider the whole discourse together in order perfectly to conceive the sense of it, and to give to each expression not so much the signification it may receive in itself as that which it ought to have from the thread and spirit of the discourse."
Viewing these three articles together, then, as they all relate to one general subject, it is plain that they import a full confirmation of all our confiscation laws. It is not stipulated that one of them shall be repealed or impaired in the least, only so far as the recommendation might have such an effect. How is it, then, that a debt legally confiscated and vested in the State by an actual payment into the treasury can be considered as given up, or the Act of 1779 repealed?
If the fourth article is considered to stand alone, then such a construction as is contended for would appear more reasonable. But why should we resort to this article alone to be informed of the intention of the contracting parties? Were the other two inserted for no purpose? They, in my opinion, fully explain the 4th, because they show that it was not the intention of our commissioners to do anything which should repeal an act of the Legislature of any state, and that they only intended to give a right to recover such debts as were then due and unpaid; not being claimed by any state as her property, which would take in the debts in most of the states (for few of them, I believe, actually confiscated those debts, although most of them passed laws for their sequestration), which, not affecting the original creditor's right absolutely, would of course be properly the subject of a treaty, and come under the operation of this 4th article. If this was not what our commissioners intended, why do they stipulate for recommendation to the several state legislatures for repeal of the confiscation laws? Why do they require Congress earnestly to recommend to the state legislatures to provide for restitution, etc.? Why do they agree that other persons than those particularly described should have leave to go to any part of the United States, to remain twelve months unmolested, in their endeavors to recover their estates, rights, and properties? Why was it necessary to stipulate that this class of persons should pay the bonafide price for which their property sold on the same being delivered up by the *Page 575 
legislature? And why was it necessary to state in the 6th article that there should be no further confiscation, and no further loss, etc.? If the confiscation laws were repealed, there could not be any further loss, and in fact there had been none, as the creditor was to recover the full value of his debt, and if the commissioners had a right to repeal a law of the state, why have they not done so positively in the cases where they have agreed to recommend only? For they have in that case equally shown their willingness to restore the property as in the case of debts; but so far from that, where any part of the contract of our commissioners was likely to affect existing laws of any of the states, they have only stipulated that Congress should recommend a repeal of those laws so as to make them conformable to such agreement; which is all they have done or had the right to do. Our commissioners knew that it would not do to go further than this, if they had the right, even. The states never would have consented to such a thing in the then situation of their affairs, and the people would have revolted at the very mention of a thing so shocking to their feelings, at that particular period, when the sufferings and miseries of the war were fresh in their minds. If any other than real British subjects were intended to be benefited by the 4th article, it could only mean that no further impediments than those already created by the acts of the legislatures should be imposed. If this is not what was intended, and, on the contrary, they intended by these general words to repeal every law of the states, which raised such an impediment, they must surely have acted on the supposition that they were clothed with authority to effect such a repeal, or they were not acting with good faith, and if this were the case, how can we account for their stipulating to recommend only in every case where a repeal is mentioned? If they had a right to repeal our laws in one case, so they had in another; and there was as much reason for their doing it in one case as in the other, if we suppose a complete restitution was desired and intended as far as they were enabled to make it. If this idea that our laws were confirmed by the treaty itself, the commissioners having gone on the principle of their not possessing authority to effect a repeal of them absolutely, is not made already sufficiently plain and evident, other proofs of it are not wanting.
1. The commissioner, on the part of Great Britain, himself so understood it; he attempted to get something more done for this class of people; but our commissioners, for the reasons already mentioned, refused to go any greater lengths to favor them. As a proof of this, I beg leave to refer to the correspondence on the subject between the commissioners on both sides, as it is stated by Mr. Jefferson, when Secretary of State, in his correspondence with Mr. Hammond, the British minister, p. 71, Nos. 8, 9, 73, 10, 76, 11. *Page 576 
2. It was also so understood by the ministry and members of Parliament in Great Britain, in the year 1783, when the preliminary articles were under consideration. Ibid., 32, 33.
And these proofs are of such a nature as to carry entire conviction to my mind. Can any reasonable man suppose that our commissioners intended by this 4th article to repeal every law of the states which confiscated these debts, when they all join in declaring that they have no right to repeal any one of those laws, because Congress, from whom they derived their authority, had no such right? And when the British commissioner, on that declaration being persisted in, at length agreed to accept such terms, and such alone, with respect to the refugees, as our commissioners professed they had a right to agree to; and when the British ministry and the Parliament, who, we must suppose, would judge full favorably for themselves, declared they were satisfied that our commissioners had gone the full length of their authority, and did not pretend to require anything more of us, with respect to confiscations, than what the recommendations would probably effect. It is clear, then, they treated with us on this principle; and if we act up to that, although possibly the commissioners might have possessed greater powers than they thought, and declared they did, yet we are surely not bound to extend the contract further than it was originally intended by the parties on both sides, when acting on this principle, thus fairly declared and understood at the time. But the true meaning of this 4th article is, I humbly conceive, this: Those who were real British subjects, residing in Great Britain when the war commenced, should meet with no legal impediment to the recovery of their just debts, etc., that is, such debts as then existed, not forfeited and vested in the state by any act of the legislature, although the right to recover them had been taken away during the war, by the creditors becoming an alien enemy, or by some positive statute, disabling him to sue, or sequestering his property; nor were they to be impeded in their recoveries by the operation of tender or pine barren laws, or paid off with depreciated paper money, at its nominal value. These were the impediments that opposed themselves to the recovery, and these it was necessary to remove, and in the manner they have been removed by this 4th article, in order to give that full recovery which was had in view, and in fact it is nothing more than saying, we will be friends, hostilities shall cease, and courts of justice shall be opened for all just recoveries on both sides. And although this might seem unnecessary in some degree, yet it is usual in such treaties, and serves to ascertain to the creditor beyond doubt the right to sue on the return of peace; which right it is necessary should be declared by some public act of the government before it could be noticed in the courts *Page 577 
of law, although it should be otherwise ever so well known. But nothing of all this goes to show what shall be recovered; that, I apprehend, would have been expressed in stronger and more explicit terms had it been the intention of the parties to regulate it in this clause. That was an office left, however, for the 5th article to perform, which says, with regard to persons of the description of the present plaintiffs, for they cannot be considered real British subjects, I conceive that they shall have leave to remain among us twelve months, endeavoring to recover their estates, rights, and properties, under the recommendation of Congress. These words of themselves are so full and expressive as to take in debts and every other species of property to which they might set up a claim; and, if so, they are doubly provided for in the case of debts if they are also to be included in the 4th article. But this cannot be the case, for why was it necessary to make any distinction at all if every description of subjects were equally alike to be benefited? To construe the treaty in such a manner as to work a repeal of the act of Assembly would be derogatory to the independence of the state, and productive of injustice and oppression. On the other hand, to preserve the independence of the state, and say that the treaty does not repeal any of her acts, and yet a very numerous class of creditors will be provided for, in the 4th article, which thus removes the impediment to the recovery of those debts which had never actually been confiscated. To construe the treaty as is contended on the other side, those who have paid must pay again; for in this sense of the wordcreditors, as much as any other persons the plaintiffs must be creditors.
But every treaty ought to be according to the fundamental laws and constitution of the country for which it is made.
Vattel, 352, sec. 228: "Thus, also, an oath cannot render a treaty valid that is not so, justify a treaty that is unjust in itself, nor lay an obligation to fulfill a treaty lawfully concluded when a case is pretended where its observation would be unlawful. As, for instance, if the ally, to whom succors have been promised, undertakes a war that is manifestly unjust. In short, every treaty prejudicial to the state, every treaty made for a dishonest cause, or contrary to the fundamental laws, being null in its own nature; the oath that may have been added to such a treaty is also null, and falls with the act it was intended to strengthen." The same doctrine is laid down in p. 192, sec. 265; p. 296, sec. 154; p. 297, sec. 156.
And in p. 637, part of sec. 10, this author says: "When a limited power is authorized to make peace, as he cannot of himself grant every condition, in order to treat on sure grounds with him, it must be required that the treaty of peace be approved by the nation or power which can make good the conditions. As, for instance, in treating of a peace with *Page 578 
Sweden, if a defensive alliance and a guarantee be required for the condition, this stipulation will be of no effect unless approved and accepted by the diet, which alone has the power of imparting validity to it. The kings of England conclude treaties of peace and alliance, but by these treaties they cannot alienate any of the possessions of the crown without the consent of Parliament, neither can they, without the concurrence of the same body, raise any money in the kingdom. Therefore, when they negotiate any treaty of subsidies, it is their constant rule to communicate the treaty to Parliament, that they may be certain of its concurrence, to make good such agreement."
If, therefore, of two constructions, the one be against the fundamental law and the other consistent with it, that which is repugnant to the fundamental law must be abandoned, and the other received; otherwise, the treaty itself must be abandoned. And the construction contended for here seems to be against our Constitution.
1. The General Assembly have no power but what is given to them by the people, declared in the Constitution. In limiting this power they have said "that no man shall be deprived of his property but by the law of the land." Bill of Rights, sec. 12.
2. From the nature of a debt, being a thing which becomes obligatory only by the expressed consent of the individual to be charged, you cannot say that a man shall be a debtor and pay the debt who is not a debtor.
3. By the law of nature, the Legislature is under an obligation to perform what it has promised; and the person promised has a right to that performance; therefore, it has no right to make void what it has engaged to support. And we have already seen that it has engaged to support the payment here pleaded as an extinguishment of the debt. Can the Legislature now, after the debt is extinguished upon its own principle, pass a law to revive that debt, nullify the obligation of its promise, upon the faith of which the debtor has parted with his money? That it has no such right might be proved, and the impropriety of exercising it made evident, by stating to your Honors the numberless instances of the most horrid injustice and hardship that it would be productive of; but I conceive it to be too plain to admit of doubt, and therefore I shall take it for granted that such a right does not exist in the Legislature; and, if so, much less was it in Congress or their commissioners. Congress was a mere executive body, possessing no other powers but such as are generally exercised by the executive branch of a government. This is the light in which the commissioners viewed it, as I have before shown; this is the light in which the British government viewed it, as I have also before shown; and it is further manifested by their long detention of the Western Posts, because those acts of Assembly which opposed the *Page 579 
operation of the 4th article of the treaty were not repealed. This is the light in which Congress uniformly viewed it when they required of the states, at different periods, to repeal those laws which opposed the treaty. And this is the light in which I conceive every candid mind must view it, when he deliberately examines and considers the articles of confederation. As to the 6th article of the Constitution of the United States, it surely never intended to give greater efficacy to the treaty than it had before. What reason was there for making it more binding on the states under the new government than it was under the old? We had received no new consideration from the other party for such an extension of the obligation on our part. Could it have been suspected at the time the Constitution was adopted in our state that it would have this operation; that single article would have raised from every quarter the most insurmountable obstacles to its adoption; the fact is, that article was inserted as one of course, to put the treaties that had been made under the old government in statu quo. For, without such an article, it would have been very questionable how far those treaties would be binding upon us under the new government. And as to the act of Assembly of 1787, making the treaty the law of the land, I have always understood that this act was passed in conformity to a requisition of Congress, to afford a proper pretext for demanding a surrender of the Western Posts, which were withheld on the pretense that the treaty had not become the law of the land, not having been ratified by the several state legislatures, but that it by no means was intended to extend the length contended for by the plaintiffs. Had that been the intention of the Legislature, can it be doubted but that something more would have been expressed in the act as to that part of the treaty, at least, which is recommendatory only; it would have been necessary, I humbly conceive, to have framed a law entirely different from that which passed, both as to the title and substance of it; and this the journals of that Assembly show us was attempted (not that I know or believe that it was the wish of a single member), but it does appear that the first bill introduced on the subject was entitled "A bill to repeal such laws as militate against the treaty of peace made with Great Britain," p. 8 of the Senate Journals, and 9 and 17 of the Commons. This bill, it seems, was dropped after one or two readings, and the other was afterwards brought in and passed; which sufficiently shows the intention of the Assembly, and which has been further manifested at various times since by their proceeding further to carry the confiscation laws into effect and to bring suits under them; one of which is now pending in Newbern Superior Court. But, in fact, this act could not be a repeal of the confiscation laws only in such cases where the treaty contains an absolute stipulation; and that, I have attempted *Page 580 
to show, was not intended in the case of the present plaintiffs; for, as to them, it was only recommendatory; and I rest satisfied that this act, making the treaty the law of the land, has done nothing for them. But suppose it should be considered as a repeal, yet it cannot be extended to the reobligation of the defendant. For
1. A subsequent law repugnant to the former cannot be so construed as to do away a right lawfully acquired under the former law. In proof of this, I shall read 2 Bacan, 75, the substance of a case reported in 2 Mod., 310, determined upon the statute of frauds and perjuries in England: "That the clause which enacts that no action shall be brought, etc., to charge an executor, etc., extends not to promises made before, though to be performed after, the making of the statute; for it would be against natural justice that a promise made upon good consideration should be destroyed by the retrospect of a law which none could divine would be made."
2. It has been always held that everything which was done under a law while it was in force was valid, although the law should be afterwards repealed, 4 Bacon, 638. "If a statute be repealed, all acts done under it, while it was in force, are good." Jenk. Cent., 233, Pl. 6. Then, here is at once an insurmountable objection to the plaintiffs' recovery. It is admitted that the state had the right to confiscate and direct the payment of the debt into the treasury, and the money is paid in accordingly, before the repeal takes place; this payment, then, was something done under the law of confiscation while it was in force, and is valid agreeably to the principle which I have established; therefore, the repeal cannot affect it.
3. If the statute of repeal is against common right and reason, it is void. 4 Bacon, 635; 8 Rep., 118. This repeal, if it is one in reality, is surely against common right and reason. When the debtor paid his money to the State, it was in consequence of the Legislature declaring to him that he should be discharged from paying again to the plaintiffs; and, replying on that, he makes the payment and has a right to the discharge; for it is admitted that the Legislature was competent to pass a law of this kind, transferring the right to receive the debt to the State, and, if so, the payment was as good as if it had been made to the plaintiffs themselves; and it would be equally unjust to make the defendant pay it again. If he is compelled to do so, it may much distress him now, when the sum is very considerably increased by the accumulation of interest and costs. I therefore do conceive that on this principle also the plaintiffs ought to be barred of a recovery; and upon these grounds, as I have occupied so much of the time of the Court, I will submit my client's case to the consideration of your Honors, as to you any recapitulation of them might appear to be more tedious than necessary. *Page 581 
This is an action of debt, brought by the plaintiffs to recover of the defendant on an obligation made in the year 1776. The defendant has pleaded four several pleas in bar, which are now for the decision of the Court by demurrer.
I shall consider of the case as it appears by the first plea which places the defendant on the most advantageous ground, as a decision on that will probably govern all the cases arising out of the subsequent pleas.
The case, it appears by the first plea, is as follows: The plaintiffs were merchants, residents of North Carolina, before and at the time of the Declaration of Independence. By an act of the Legislature of North Carolina, passed in April, 1777, it was, among other things, enacted, "That all persons, being subjects of this State, and now living therein, or who shall hereafter come to live therein, who have traded immediately to Great Britain or Ireland, within ten years last past, in their own right, or acted as factors, storekeepers, or agents here, or in any of the United States of America, for merchants residing in Great Britain or Ireland, shall take an oath of abjuration and allegiance, or depart out of the State." By the same act, such persons were (681) permitted to sell their estates, to export the amount thereof in produce, and to appoint attorneys to sell and dispose of their estates for their use and benefit. The plaintiffs, falling within the description of persons contemplated by this act, and refusing to take the oath, departed the State; the debt which is the subject of the present suit then existing. By subsequent acts of the Legislature, all the estates, rights, properties, and debts of certain persons, among which the plaintiffs are specially named, are declared to be confiscated; and the debts due to such persons are directed to be paid to certain commissioners, to be appointed by the county courts for that purpose, by all persons within the State, owing the same, under pain of imprisonment; which payment it is declared shall forever indemnify and acquit the persons paying the same, their *Page 612 
heirs, etc., against any future claim for the money mentioned in the receipts or discharges of such commissioners. In obedience to those acts, the defendant paid the debt in question to the commissioners authorized to receive it, and relies on that payment as legal, and a full and sufficient discharge. The plaintiffs, admitting the fact of payment, rely on the construction of the treaty of peace; the law of the State declaring that treaty to be part of the law of the land; and the Constitution of the United States. The counsel for the plaintiffs, in support of their claim has, in the course of his argument, presented to the view a doubt whether the debt in the present question has been confiscated in a strictly legal sense, by any of the acts called confiscation acts, and has urged that doubt strenuously and with much force of argument; contemplating them as a body of penal law, and, of course, subject to the legal rules of construction in such cases. The observations on that point would merit much attention; but I deem it not absolutely necessary to investigate that question in forming an opinion upon the present case; and shall confine my observations solely to the law and the facts, as they arise out of the pleadings, in the first plea of the defendant, which admits alone of this question, viz.:
Are the plaintiffs barred of recovery?
(682) It would appear quite unnecessary to inquire whether Congress, under whose authority the treaty was negotiated, was vested by the states with a power competent to enter into such a contract, had not part of the arguments of the defendant's counsel seemed to require it. No one will doubt, if they had the power, the treaty consequently became obligatory on the people of the United States, when made and duly ratified.
Whatever agreement the states may have entered into, at the Declaration of Independence, and to what purposes and extent that agreement may or may not have bound them, as a confederated body, it is clear that at a subsequent period, and previous to the negotiation of this treaty, they, by their delegates in Congress, formed and entered into a solemn compact, by which they plight and engage the faith of their constituents, to abide by the determination of the United States in Congress assembled, on allquestions which by the confederation are submitted to them; and that the articles thereof shall be inviolably observed by the states. Among many other portions of sovereignty which the states thought proper to deposit in that confederated head was the sole and exclusive right and power of determining on peace and war (except in certain cases specially enumerated), of sending and receiving ambassadors, entering into treaties and alliances. No words can be more comprehensive or express, relative to the point in question; nor is there offered to my mind the least room for doubt. Admitting for *Page 613 
argument's sake what has been contended, that the ministers, who negotiated the treaty, exceeded the powers granted them, certainly the ratification of that instrument, by Congress confirmed and legalized all that had been done by them; and if it could be supposed, as has been said, that Congress in the ratification of it exceeded the powers vested in them by the states, the act of Assembly of this State, passed in 1787, must have extinguished every scintilla of doubt as to its validity and obligatory force on their citizens. The act is a perfect recognition of the whole treaty, declares it to be part of the law of the land, and directs the judges to decide accordingly. The last mentioned act must surely be sufficient to satisfy the mind of the most scrupulous and (683) skeptical. For myself, I do not hesitate to declare that it adds nothing to the validity or legality of the treaty; that its ratification by Congress was alone sufficient, and that the act of Assembly of the State was superfluous.
The counsel for the defendant has contended that, by the operation of the acts of confiscation, and the payment into the treasury, the plaintiffs were wholly divested of their right; and the same, if existing at all, was vested in the State. This forms a material part of his defense, and if it had been clearly evinced that the right of the plaintiffs was wholly extinguished by the operation of the confiscation acts, and could not possibly be revived or restored by any subsequent act of the State, or the nation, it would follow, of course, that they could have no demand against the defendant. In support of this argument it is said, 4 Bacon, 637, that all acts done under a statute while in force are good, notwithstanding a subsequent repeal. I am ready to admit the principle in its fullest extent, in the exposition of a statute or municipal law of any particular state. It is consonant with reason, and is justified by the necessity of the case; it prevents much confusion and embarrassment and insures a ready submission to the laws, by a confidence in the security impliedly promised to such obedience. If the treaty was now to be considered as an act of the State, and emanating from the same authority only that produced the acts of confiscation, this reasoning might be solid. But that instrument cannot be subject to the ordinary rules of construction, which govern in the exposition of statutes of a particular state. These have for their object the regulation of the rights of a distinct community or society only, whose interests, being similar, are equally affected by a uniform regulation of their rights; who are alike united by the allegiance due to and protection from the same government; that is a compact formed between two separate and distinct nations, relative to certain specified subjects which involve interests of their respective citizens or people, unavoidably clashing with each other. *Page 614 
(684) The one is an act of a State, but a component part of the nation, providing for the benefit of its own citizens. The other a compact of the whole nation (of which that State is but a part) with another nation, which must necessarily control all acts issuing from the inferior authority which might contravene it. This is evinced by that plain and strong expression in the Constitution of the United States, which declares, "That all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." Taking it for granted, then, that the treaty is not to be governed, when in opposition to particular laws, by the rigid rules of the common law, nor to be restrained in its operation by any statute or any particular state, but that "it ought to be interpreted in such manner as that it may have its effect, and not be found vain and illusive,"I will proceed to consider of the operation of the 4th article.
Art. 4th. "It is agreed that creditors on either side shall meet with no lawful impediment to the recovery of the full value in sterling money of all bona fide debts heretofore contracted."
This article appears to me so clear, precise, and definite that one would be at some loss to select other words to render it more so. But it has been contended by the defendant's counsel that, by a true construction of this article, it will appear much less general than the expressions would warrant; that it is a provision for real British subjects only; that is, persons resident in Great Britain at the commencement of the war; a term used in contradiction to many other descriptions of people, who, in the course of the war, took part with that nation, and that this construction is justified by the term sterling money. In order to support this exposition, a reference has been had to the 5th and 6th articles.
The 4th article contains the only stipulation with respect to debts. In the whole instrument it is mutual and general in its expression, not limited or restrained by any particular word, to any description (685) of persons, as is evident in the 5th article. If that had been in the contemplation of the parties, they could not have overlooked the necessity for these distinctions; nor are we at liberty to presume it. In the next article, the distinction is made with great accuracy, with regard to those who may endeavor to procure a restitution of their lands and other property. With respect to the expression "sterling money," it appears to me that was probably concluded on as a standard whereby to estimate the value of money due; it being, no doubt, apprehended that a depreciated paper medium circulated in many states of the Union, the nominal sum in which might not produce intrinsic value of the debt due. *Page 615 
Another construction has been placed on this article, equally, in my opinion, unfounded, with the foregoing. It has been said, the article was only intended to take off from British subjects their disability as alien enemies to sue. Everyone knows that disability can only exist during the continuance of a war, it would have been therefore unnecessary to provide for it in a treaty of peace, when it is obvious the peace itself, agreeably to the long established principles of law, removed all such disability without any special stipulation. The word recovery admits not of such an idea. The terms sue and recover have very different import, in practice. The difference is daily exemplified in our courts, and the distinction appears evident, in the body of that instrument; in the latter part of the 5th article it is stipulated that certain persons shall meet with no lawful impediment in the prosecution of their just rights. In the 4th article the words are no lawful impediment to the recovery of their debts. The distinction is obvious, and the terms aptly applied in each case. In the former, relative to lands and other property which had been confiscated, and a restoration of which entirely depended on the liberality of the legislatures, the term recovery would have been improper; in the latter, in which a payment to the creditor was positively stipulated, the expression is correct.
Vattel says, p. 369: "When an act is conceived in clear and precise terms, when the sense is manifest, and leads to nothing absurd, there can be no reason to refuse the sense which this treaty (686) naturally presents, to go elsewhere in search of conjectures in order to extinguish or restrain it, is to endeavor to elude it."
It is therefore my opinion that this article does control the operation of the acts of confiscation, relative to debts; that the plaintiffs in this case are entitled to recover on the first demurrer; the plea in that case being the strongest ground of defense made by the defendant; that therefore judgment be given by the plaintiffs on each of the demurrers.
The State, who has compelled the payment from the creditor by a threat of severe punishment, will certainly feel bound by every principle of moral obligation to reimburse, in the most ample manner, all those who have made such payments. In addition to the moral tie that it is bound by, a solemn promise so to do is clearly expressed by an act of the Legislature.
I have only to observe that I have considered this case as of the utmost importance; that I have given it all the attention and consideration in my power to bestow at this time and place; that if my opinion is founded in error, which is possibly the case, happily for the defendant, there is a higher tribunal where the error may be corrected. *Page 616